UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 11-cv-00293-JCS |
| Plaintiffs, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS |
| ENVIRONMENTAL PROTECTION AGENCY, et al., | **Dkt. Nos. 203, 204** |
| Defendants. | |

## I.       INTRODUCTION

In this action, Plaintiffs Center for Biological Diversity and Pesticide Action Network North America ("Plaintiffs") allege the Environmental Protection Agency and Gina McCarthy, Administrator of the Environmental Protection Agency (collectively, "EPA") violated the section 7(a)(2) of the Endangered Species Act ("ESA") by failing to initiate and reinitiate consultations regarding the effect of pesticides on endangered species and critical habitats. The Court previously granted motions to dismiss filed by the EPA and Intervenors (collectively, "Defendants"), and allowed Plaintiffs to amend their allegations. *See Center for Biological Diversity v. E.P.A.*, No. 11-0293 JCS, 2013 WL 1729573 (N.D. Cal. April 22, 2013).

Presently before the Court are Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint (hereafter, "Motions"). For the reasons explained below, the Motions to Dismiss are GRANTED in part and DENIED in part.[1]

//

//

_____

[1]  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

II.     **BACKGROUND**

A.      **The Endangered Species Act ("ESA")**

The ESA provides for the listing of species as threatened or endangered.  *See* 16 U.S.C. § 1533.  The Secretary of Commerce and the Secretary of the Interior (collectively, the "Secretary") share responsibility for implementing the ESA.  The Secretary of Commerce is responsible for listed marine species and administers the ESA through the National Marine Fisheries Service ("NMFS").  The Secretary of the Interior is responsible for listed terrestrial and inland fish species and administers the ESA through the U.S. Fish & Wildlife Service ("FWS").  *See id.* § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).  The NMFS and FWS are hereinafter collectively referred to as the "Service."

Section 7(a)(2) of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical . . . .

16 U.S.C. § 1536(a)(2).  The "agency action" that triggers a federal agency's duty to consult under section 7(a)(2) is the focus of this ESA litigation.

When Congress enacted the ESA, it authorized the Secretary "to promulgate such regulations as may be appropriate to enforce" the ESA.  16 U.S.C. § 1540(f).  The Secretary has promulgated regulations that, *inter alia*, define "agency action" to include "all activities or programs of any kind authorized, funded or carried out … by Federal agencies."  50 C.F.R. § 402.02.  Further, "[s]ection 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control."  50 C.F.R. § 402.03.

The ESA's implementing regulations describe the consultation process required by section 7 of the ESA.  Under 50 C.F.R. § 402.14(a), "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  *See id.*  If the agency determines that an action "may affect listed species or critical habitat," then

2

1    "formal consultation [with the Service] is required." *Id.* If formal consultation is required, the

2    Service must prepare a biological opinion stating whether the proposed action is likely to

3    "jeopardize the continued existence of listed species or result in the destruction or adverse

4    modification of critical habitat." *Id.* § 402.14(g). If the biological opinion finds that jeopardy is

5    likely, it must include, if possible, "reasonable and prudent alternatives" to the proposed action.

6    *Id*. § 402.14(h)(3). Thereafter, the agency determines how to proceed with its action in light of the

7    Service's biological opinion. *Id.* § 402.15.

8          The ESA regulations further provide that an agency must reinitiate consultation with the

9    Service "where discretionary Federal involvement or control over the action has been retained or

10   is authorized by law," and when one of the following triggers occurs:

11          (a) If the amount or extent of taking specified in the incidental take
            statement is exceeded;

12

13          (b) If new information reveals effects of the action that may affect
            listed species or critical habitat in a manner or to an extent not
            previously considered;

14

15          (c) If the identified action is subsequently modified in a manner that
            causes an effect to the listed species or critical habitat that was not
            considered in the biological opinion; or

16

17          (d) If a new species is listed or critical habitat designated that may
            be affected by the identified action.

18   50 C.F.R. § 402.16.

19         The ESA contains a citizen suit provision which authorizes any person to "commence a

20   civil suit on his own behalf . . . to enjoin any person, including the United States and any other

21   governmental instrumentality or agency . . . who is alleged to be in violation of any provision of

22   this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). The

23   citizen suit provision also provides that "district courts shall have jurisdiction . . . to enforce any

24   such provision or regulation." *Id.* § 1540(g).

25         **B.    The Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA")**

26         FIFRA establishes a regulatory scheme for the distribution, sale and use of pesticides.

27   7 U.S.C. §§ 136 *et seq*. FIFRA defines a "pesticide" as "any substance or mixture of substances

28   intended for preventing, destroying, repelling, or mitigating any pest . . . ." 7 U.S.C. § 136(u). An

United States District Court
Northern District of California

"active ingredient" is defined as "an ingredient which will prevent, destroy, repel, or mitigate any pest." *Id*. § 136(a)(1).  A pesticide may contain one or more active ingredients.  *See, e.g*., 7 U.S.C. § 136a(c)(1)(F)(i) (referring to "pesticides containing active ingredients"); 7 U.S.C. § 136a(c)(8) (referring to the EPA's risk-benefit evaluation "of the ingredients of a pesticide or any of its uses").  Consistent with the language of FIFRA, the Court uses the terms "pesticide," "product," and "pesticide product" interchangeably in this order.

### 1.      Registration of Pesticides

Under FIFRA, a pesticide may not be distributed or sold in the United States unless it has been registered by the EPA.  7 U.S.C. § 136a(a).  FIFRA provides that the EPA "shall register a pesticide if" the EPA determines:

> (A) its composition is such as to warrant the proposed claims for it;
>
> (B) its labeling and other material required to be submitted comply with the requirements of this subchapter;
>
> (C) it will perform its intended function without unreasonable adverse effects on the environment; and
>
> (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5).  These requirements will hereinafter be referred to as the "Paragraph 5 Requirements."

Congress has constructed a detailed procedure for the registration of pesticides.  *See* 7 U.S.C. § 136a(c).  First, each applicant for the registration of a pesticide must file an application with the EPA with a statement which includes, *inter alia*, "the name of the pesticide," "a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use," and "the complete formula of the pesticide." *Id*. § 136a(c)(1).  The applicant must also submit data in support of registration. *Id*. § 136a(c)(2).

Promptly after receiving the applicant's statement and data, the EPA must publish in the Federal Register "a notice of each application for registration of any pesticide if it contains any new active ingredient or if it would entail a changed use pattern.  The notice shall provide for a

United States District Court
Northern District of California

period of 30 days in which any Federal agency or any other interested person may comment." *Id.* § 136a(c)(5).

Upon receiving the application for registration of a pesticide, the EPA must review the data and, "as expeditiously as possible," either register a pesticide if the EPA determines that the pesticide complies with the Paragraph 5 Requirements, or, if the pesticide does not comply with the Paragraph 5 Requirements, notify the applicant of the EPA's determination and the basis for that decision. *Id.* §§ 136a(c)(3)(A), 136a(c)(5), 136a(c)(6).

The EPA is required to give expedited review to applications for registration of an "end-use pesticide that, if registered as proposed, would be identical or substantially similar in composition and labeling to a currently-registered pesticide identified in the application," or that would only differ in ways "that would not significantly increase the risk of unreasonable adverse effects on the environment." *Id.* § 136a(c)(3)(B). A pesticide may also be conditionally registered if the foregoing is met, and if "approving the registration or amendment in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment." *Id.* § 136a(c)(6).[2]

As part of the registration process for each pesticide, the EPA must classify the pesticide and the uses of the pesticide "as being for general use or for restricted use." *Id.* § 136a(d)(1)(A). If the EPA determines that the pesticide "may generally cause . . . unreasonable adverse effects on the environment," the EPA must "classify the pesticide, or the particular use or uses to which the determination applies, for restricted use." *Id.* § 136a(d)(1)(C). Otherwise, the EPA must classify the pesticide or certain uses for general use. *Id.* § 136a(d)(1)(B). The EPA may also change a classification of any pesticide from general use to restricted use if "necessary to prevent unreasonable adverse effects on the environment." *Id.* § 136a(d)(2).

United States District Court
Northern District of California

---

[2] Moreover, "[p]roducts which have the same formulation, are manufactured by the same person, the labeling of which contains the same claims, and the labels of which bear a designation identifying the product as the same pesticide may be registered as a single pesticide; and additional names and labels shall be added to the registration by supplemental statements." 7 U.S.C. § 136a(e).

1   After the pesticide is registered, a registrant may modify the EPA's approved label for the

2   pesticide if the registrant notifies the EPA "in writing no later than 60 days prior distribution or

3   sale of a product bearing the modified label," and the EPA "does not disapprove of the

4   modification . . . ." *Id.* § 136a(c)(9)(C).

### 2.    The "Reregistration" Program

6   In 1988, Congress enacted FIFRA § 4, which mandates that the EPA "reregister . . . each

7   pesticide containing any active ingredient contained in any pesticide first registered before

8   November 1, 1984," pursuant to a five-phase process. *See* 7 U.S.C. § 136a-1(a); H.R. Rep. 100-

9   939 (1988), *reprinted at* 1988 U.S.C.C.A.N. 3474, 3478-79, 3529.

10   In phase one, the EPA was required to list "the active ingredients of the pesticides that will

11   be reregistered." *Id.* § 136a-1(b)(1).  The order of the list was intended to prioritize active

12   pesticide ingredients that pose relatively greater health and environmental concerns.  *See id.*

13   § 136a-1(c).

14   In phase two, the registrants were required to submit to the EPA their notice "to seek

15   reregistration," as well as identify "missing and inadequate information for such pesticides, and

16   commitments by registrants to replace such missing or inadequate data within the applicable time

17   period." *Id.* § 136a-1(b)(2); *see id.* § 136a-1(d).

18   In phase three, the registrants submit required information to the EPA.  *See id.*

19   §§ 136a-1(b)(3), 136a-1(e).  Such information includes, *inter alia*, a summary of each study

20   concerning the active ingredient, a reformat of the data from each study, and any "additional

21   factual information regarding unreasonable adverse effects on the environment of the pesticide…."

22   7 U.S.C. § 136d(a)(2); *see id.* § 136a-1(e)(1).

23   In phase four, the EPA conducts "an independent, initial review" of the submission under

24   phases two and three, identifies any outstanding data requirements, and issues requests for

25   additional data.  *Id.* § 136a-1(b)(4); *see id.* § 136a-1(f).

26   In phase five, the EPA reregisters the pesticides after the completion of several steps.

27   First, the EPA must "conduct a thorough examination of all data submitted … concerning an

28   active ingredient . . . ." *Id.* § 136a-1(g)(1).  Second, the EPA must "make a *determination as to*

*eligibility for reregistration* . . . for all active ingredients subject to registration . . . ." *Id.*

§ 136a-1(a) (emphasis added).  The EPA issues a Reregistration Eligibility Determination, or

"RED," which corresponds to an active pesticide ingredient.  *See id.*  Each RED "summarizes the

risk assessment conclusions and outlines any risk reduction measures for the pesticide to continue

to be registered in the U.S."[3]  Third, "[b]efore reregistering a pesticide," the EPA must "obtain any

needed *product*-specific data regarding the pesticide . . . and shall review such data within 90 days

after its submission." *Id.* § 136a-1(g)(2)(B)(i) (emphasis added).  Unless there are extraordinary

circumstances, the EPA must require this data to be submitted "not later than 8 months after" the

EPA's issuance of the RED.  *Id.* § 136a-1(g)(2)(B)(ii).  Fourth, after conducting the required

evaluations of the active ingredient and product-specific data, the EPA must "determine whether

to reregister a pesticide by determining whether such pesticide meets the requirements of section

136(c)(5)" of FIFRA.

 "If the Administrator determines that a pesticide is eligible to be reregistered, the [EPA]

shall reregister such pesticide within 6 months after the submission of the [product-specific] data

concerning such pesticide . . . ." *Id.*; *see id.* § 136a-1(g)(2)(B).  The EPA also must take

appropriate regulatory action if it "determines that a pesticide should not be registered . . . ." 7

U.S.C. § 136a-1(g)(2)(D).

The EPA started a pilot program in 1998 to include public participation with respect to the

reregistration of organophosphate pesticides, and in 2000, the EPA solicited public comment to

expand the pilot program for reregistration of all pesticides.  *See id.*; 65 Fed. Reg. 14,200 (Mar.

15, 2000).  In 2004, the EPA announced its program to provide opportunities for public comment

with respect to pesticide reregistration to "increase transparency and stakeholder involvement in

the development of pesticide risk assessment and risk management decisions."  69 Fed. Reg.

26819 (May 14, 2004).

### 3.    Registration Review

Congress also amended FIFRA by establishing the program of "Registration Review,"

---

[3] http://www.epa.gov/pesticides/reregistration/definitions.htm (last visited July 12, 2014).

United States District Court
Northern District of California

1   which requires the EPA to "complete the registration review of each pesticide or pesticide case"[4]

2   every 15 years.  *See* 7 U.S.C. § 136a(g)(1)(A)(iii), (iv).  Congress instructed EPA to promulgate

3   regulations establishing "a procedure for accomplishing the periodic review of registrations." 7

4   U.S.C. § 136a(g)(1)(A)(ii).

5         Through the promulgation of regulations, the EPA established a procedure for registration

6   review that starts with the creation of "a docket for each registration review case" that is open to

7   the public.  40 C.F.R. § 155.50.  The docket contains "information that will assist the public in

8   understanding the types of information and issues" the EPA "may consider in the course of the

9   registration review," including "[r]isk assessment documents." *Id*. § 155.50(a)(3).  The EPA

10   publishes notice in the Federal Register announcing the docket, and establishes a 60-day comment

11   period in which "interested persons may identify any additional information they believe" should

12   be considered in the course of registration review.  *Id*. § 155.50(b).

13         In conducting the registration review, the EPA assesses "any changes that may have

14   occurred since the Agency's last registration decision to determine . . . whether the pesticide still

15   satisfies the FIFRA standard for registration."  40 C.F.R. § 155.53(a).  The EPA decides "whether

16   any new data or information on the pesticide . . . warrant conducting a new risk assessment or a

17   new risk/benefit assessment."  *Id*.  The EPA also considers "whether any new data or information

18   regarding an individual pesticide product, . . . such as data or information about an inert ingredient

19   in the pesticide product or other information or data relating to the composition, labeling or use of

20   the pesticide product, warrant additional review of a pesticide product's registration."  *Id.*

21         The EPA publishes its proposed registration review decision and the bases for that decision

22   in the pesticide's registration review docket.  *Id*. § 155.58(a).  The EPA then provides a comment

23   period of at least 60 days.  *Id*.  "After considering any comments on the proposed decision," the

24   EPA issues its registration review decision or interim decision.  *Id*. § 155.58(c).

25         The regulations further provide that the EPA "may determine that there is no need to

26   reconsider a previous decision that a pesticide satisfies the standard of registration in FIFRA."  40

27

28   ————————————

[4] A "case" may be "composed of 1 or more active ingredients and the products associated with the active ingredients."  7 U.S.C. § 136a(g)(1)(A)(iii).

United States District Court
Northern District of California

8

1   C.F.R. § 155.46.  "In such cases, instead of establishing a pesticide registration review case docket

2   as described in § 155.50, the Agency may propose that . . . no further review will be necessary."

3   *Id.*  Prior to the decision to not conduct a registration review, the EPA provides notice and a 60-

4   day the opportunity for public comment.  *See id.*

5               **4.      Jurisdiction over FIFRA Actions**

6           Judicial review over the EPA's registration actions under FIFRA are governed by FIFRA

7   § 16, which provides, in relevant part:

8               *(a) District court review.*  Except as otherwise provided in this
            subchapter, the refusal of the Administrator to cancel or suspend a
9           registration or to change a classification not following a hearing and
            other final actions of the Administrator not committed to the
10          discretion of the Administrator by law are judicially reviewable by
            the district courts of the United States.
11

12              *(b) Review by court of appeals.*  In the case of actual controversy as
            to the validity of any order issued by the Administrator following a
13          public hearing, any person who will be adversely affected by such
            order and who had been a party to the proceedings may obtain
14          judicial review by filing in the United States court of appeals for the
            circuit wherein such person resides or has a place of business, within
15          60 days after the entry of such order, a petition praying that the
            order be set aside in whole or in part . . . .  Upon the filing of such
16          petition the court shall have exclusive jurisdiction to affirm or set
            aside the order complained of in whole or in part.
17

18

19  7 U.S.C. § 136n.  The Ninth Circuit has held that the EPA makes a decision following a "public

20  hearing," and therefore within the scope of FIFRA § 16(b), when it provides notice in the Federal

21  Register and an opportunity for public comment.  *See United Farm Workers v. EPA*, 592 F.3d

22  1080 (9th Cir. 2010) ("*United Farm Workers*").

23          **C.      History of this Case**

24          Plaintiffs filed this case on January 20, 2011, asserting a single claim against the EPA for

25  allegedly violating section 7(a)(2) of the ESA by failing to initiate and reinitiate consultation with

26  the Service with respect to its ongoing oversight of 382 active pesticides ingredients.  The Court

27  granted motions to intervene filed by various pesticide registrants.  *See* Dkt. Nos. 14, 81, 157.  On

28  April 22, 2013, the Court granted motions to dismiss filed by the EPA and the Intervenors, and

9

1  granted Plaintiffs leave to amend their allegations (hereafter, "Dismissal Order").  *Center for*

2  *Biological Diversity v. EPA*, No. 11-0293 JCS, 2013 WL 1729573 (N.D. Cal. April 22, 2013)

3  ("*CBD v. EPA*"); *see also* Dkt. No. 157.

4          In the Dismissal Order, the Court explained that Plaintiffs failed to state a claim under

5  ESA § 7 in their original complaint because there was no allegation of any affirmative "agency

6  action," which is necessary to trigger the EPA's duty to consult with the Service.  *CBD v. EPA*,

7  2013 WL 1729573, at *9-10 (citing *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th

8  Cir. 2012) (en banc) *cert. denied*, 133 S. Ct. 1579, 185 L. Ed. 2d 575 (U.S. 2013) ("*Karuk*

9  *Tribe*")).  In *Karuk Tribe*, the Ninth Circuit set forth a two-pronged test to determine whether a

10  federal agency must consult under section 7 of the ESA.  First, the agency must have

11  "affirmatively authorized, funded, or carried out" an underlying activity which "may affect" a

12  listed species or critical habitat.  *Id*.  Second, the agency must have "some discretion to influence

13  or change the activity for the benefit of a protected species."  *Id*.

14          Plaintiffs failed to state a claim under ESA section 7 in the previous complaint because

15  there was no allegation that the EPA undertook any affirmative act to satisfy the first prong of the

16  *Karuk Tribe* test.  *CBD v. EPA*, 2013 WL 1729573, at *9 ("Plaintiffs do not mention any

17  'affirmative act'—such [as] registering the pesticides; changing the classification; requiring

18  additional data, or cancelling, restricting or suspending a pesticide labeling or uses—at any point

19  in the Complaint.").  Rather, Plaintiffs alleged that the "EPA retains *ongoing discretionary control*

20  *and involvement* over all of these pesticides, which constituted 'agency action' subject to

21  consultation under Section 7(a)(2) of the ESA."  Dkt. No. 1, ¶ 141.  In *Karuk Tribe*, however,

22  Ninth Circuit held that "[w]here private activity is proceeding pursuant to a vested right or to a

23  previously issued license, an agency has no duty to consult under Section 7 if it takes no further

24  affirmative action regarding the activity."  *Karuk Tribe*, 681 F.3d at 1021 ("An agency must

25  consult under Section 7 only when it makes an 'affirmative' act or authorization.") (citations

26  omitted).

27          Having held that Plaintiffs failed to allege an affirmative agency action that triggered ESA

28  section 7's consultation requirement, the Court discussed subject-matter jurisdiction, although

United States District Court
Northern District of California

10

noting the analysis was "necessarily general given that Plaintiffs had not alleged specific affirmative acts for each pesticide triggering § 7 consultation."  *CBD v. EPA*, 2013 WL 1729573, at *20.  Applying the Ninth Circuit's precedent in *American Bird Conservancy v. FCC*, the Court held that although Plaintiffs only asserted a single claim under ESA section 7, "Plaintiffs' 'core objections' are to the pesticide registrations themselves," which are "'inextricably intertwined' with the EPA's affirmative act which triggers the obligation to consult under Section 7."  *CBD v. EPA*, 2013 WL 1729573, at *18 (quoting *Am. Bird Conservancy v. FCC*, 545 F.3d 1190 1193 (9th Cir. 2008) ("*American Bird*").  Thus, any affirmative act taken by the EPA with respect to a pesticide, "such as registering a pesticide, cancelling a registration, and many other acts," would be "governed by the jurisdictional provisions of FIFRA § 16."  *CBD v. EPA*, 2013 WL 1729573, at *18.  The Court wrote that if the ESA claim is based upon a registration action that "follow[s] a public hearing as interpreted by the Ninth Circuit in *United Farm Workers*, the court of appeals has exclusive jurisdiction under FIFRA § 16(b)."  *CBD v. EPA*, 2013 WL 1729573, at *18 (citing *United Farm Workers*, 592 F.3d at 1082).

The Court also rejected the Plaintiffs' contention that their ESA claim was exempt from a statute of limitations because the EPA's actions were "ongoing."  *CBD v. EPA*, 2013 WL 1729573, at *22.  The Court held that "the six-year statute of limitations in 28 U.S.C. § 2401(a) applies," and that the limitations period would "apply in relation to the affirmative act alleged with regard to each pesticide."  *Id*.  Accordingly, because Plaintiffs' complaint was filed on January 20, 2011, any claims based on the EPA's agency actions prior to January 20, 2005 are barred by the statute of limitations.  *Id*.

Finally, with respect to Plaintiffs' claims that the EPA failed to reinitiate consultation with respect to pesticides addressed in the 1989 and 1993 Biological Opinions, the Court held that Plaintiffs allegations were "too general," as Plaintiffs merely recited the language in 50 C.F.R. § 402.16.  *CBD v. EPA*, 2013 WL 1729573, at *11.  Plaintiffs also misinterpreted "how the § 402.16 factors would require the EPA to reinitiate consultation" in many ways.  *Id*.

The Court also discussed the intersection of claims for failing to reinitiate consultation with FIFRA § 16(b).  While recognizing that "the majority of events listed in 50 C.F.R. § 402.16

United States District Court
Northern District of California

1   . . . do not arise from any act undertaken by the EPA," the Court wrote that, "[i]f the modification

2   of the identified action" as contemplated in § 402.16(c) "arises from an EPA action regulated by

3   FIFRA, then jurisdiction over the appeal of such modification is governed by FIFRA§ 16." *Id*. at

4   *22.

5          In response to the amended complaint Plaintiffs filed on June 5, 2013, the EPA and

6   Intervenors moved for a more definite statement under Rule 12(e).  *See* Dkt. Nos. 160, 165, 168.

7   In an order dated November 25, 2013, the Court granted the motions in part, finding that the

8   amended complaint was vague and ambiguous with respect to the affirmative acts which allegedly

9   triggered the EPA's duty to consult.  *CBD v. EPA*, No. 11-0293 JCS, 2013 WL 6225183, at *5

10  (N.D. Cal. Nov. 25, 2013); *see also* Dkt. No. 192.  Because "other questions depend on the

11  affirmative act identified, including whether the ESA claim is timely, . . . and whether this Court

12  has jurisdiction over that particular claim, . . . clear identification of specific affirmative acts or

13  acts that trigger the duty to consult is of the utmost importance." *Id*.

14         The Court also denied the motions in part with respect to Plaintiffs' claims against the EPA

15  for failing to reinitiate consultation with respect to the active pesticide ingredients addressed in the

16  Service's 1989 and 1993 Biological Opinions.  The Court wrote that "[c]ontrary to Federal

17  Defendant's contention, the reinitiation claims are not similarly triggered by an affirmative agency

18  action, but rather, are triggered by the factors listed in 50 C.F.R. § 402.16." *Id*. at *6.

19         **D.     Second Amended Complaint**

20         Plaintiffs filed the Second Amended Complaint on January 21, 2014.  *See* Dkt. No. 198

21  (Second Amended Complaint) ("SAC").  The Second Amended Complaint asserts 74 claims

22  under the ESA involving 50 pesticide active ingredients.  *See id.* ¶ 13.  All 50 ingredients were

23  first registered prior to November 1, 1984, and were subject to the reregistration program

24  established by 7 U.S.C. § 136a-1.  The EPA has issued REDs for all 50 active ingredients.[5]

25  _____

26         [5]  The 50 pesticide active ingredients at issue are: 1,3-dichloropropene, 2-4 D salts and
    esters, acephate, alachlor, aldicarb, atrazine, bensulide, brodifacoum, bromadiolone, bromethalin,
27  captan, carbaryl, chlorophacinone, chlorothalonil, chlorpyrifos, cypermethrin, dazomet, diazinon,
    dicamba and salts, dichlorprop, dimethoate, diphacinone, diuron, ethoprop, MCPA salts-esters,
28  malathion, mancozeb, methomyl, metolachlor & isomers, metribuzin, naled, oxydemeton-methyl,

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    The Second Amended Complaint asserts 31 causes of action regarding the EPA's alleged

2  failure to consult, with each claim corresponding to a particular active pesticide ingredient.  SAC

3  ¶¶ 1566-1874.  Each failure-to-consult claim includes a paragraph identifying "specific EPA

4  actions" pertaining to an active ingredient which Plaintiffs allege "require EPA to consult under

5  Section 7(a)(2) of the ESA."  *See, e.g.*, SAC ¶¶ 1569, 1579, 1589.  For each active ingredient,

6  these "actions" consist of: (1) the EPA's issuance of the RED (or amended RED); (2) the EPA's

7  "continued discretionary control and involvement in this pesticide's registration," which Plaintiffs

8  allege is "ongoing agency action"; (3) the "EPA's completion of product reregistration for [the]

9  pesticide"; and (4) the "EPA's approvals of products containing this pesticide".  *See, e.g., id*.  For

10  this last category, Plaintiffs provide a table that "lists several products containing" the active

11  ingredient and a post-RED "approval date" for each product.  *See, e.g.*, SAC ¶¶ 1569, 120.

12    The Second Amended Complaint also asserts 43 causes of action regarding the EPA's

13  alleged failure to reinitiate consultation with respect to particular active ingredients that were

14  addressed in the FWS's 1989 and 1993 Biological Opinions (hereafter, "reinitiate claims").  SAC

15  at 428-62, ¶¶ 1875-2218.  Twenty-four of the 43 ingredients are also the subject of Plaintiffs'

16  failure-to-consult claims.[6]  In each reinitiate claim, Plaintiffs allege that the EPA issued a

17  Biological Opinion (in either 1989 or 1993), and that the EPA "retains discretionary involvement

18

19

20  oxyfluorfen, paraquat dichloride, pendimethalin, permethrin, phorate, phosmet, profenofos,

21  propanil, propargite, S,S,S-tributyl phosphorotrithioate, simazine, terbufos, thiobencarb,
   thiophanate-methyl, trichlorofon, trifluralin, warfarin, and zinc phosphide. The REDs for each

22  pesticide active ingredient can be found at: http://www.epa.gov/oppsrrd1/reregistration/status.htm
   (last visited July 13, 2014).

23    [6] The 24 ingredients at issue in both failure-to-consult and reinitiation claims are: 2,4-D,
   salts and esters (claims 2 and 32); acephate (claims 3 and 33); atrazine (claims 5 and 35);

24  bensulide (claims 6 and 36); bromadiolone (claims 7 and 38); captan (claims 8 and 40); carbayl
   (claims 9 and 41); chlorathalonil (claims 10 and 43); chlorpyrifos (claims 11 and 44); diazinon

25  (claims 12 and 47); dicamba and salts (claims 13 and 48); diuron (claims 14 and 52); ethoprop
   (claims 15 and 53); methomyl (claims 17 and 56); naled (claims 20 and 57); oxydemeton-methyl

26  (claims 21 and 58); oxyfluorfen (claims 22 and 59); paraquat dichloride (claims 23 and 60);
   pendimethaline (claims 24 and 61); phorate (claims 25 and 63); phosmet (claims 26 and 64);

27  propargite (claims 28 and 66); S,S,S-tributyl phosphorotrithioate (claims 29 and 68); and
   trifluralin (claims 31 and 72).

28

13

1   and control" which may be "used for the benefit of ESA protected species." *See e.g.*, SAC

2   ¶¶ 1876-77, 1884-85, 1892-93, 1900-01.

3         Plaintiffs also allege that "a trigger for reinitiation of consultation has occurred," and that

4   "[d]espite the occurrence of a trigger, EPA has not reinitiated consultation with the Service." *See*

5   *e.g.*, SAC ¶¶ 1878-79, 1886-87, 1894-95, 1902-03.  The "triggers" discussed in the context of

6   Plaintiffs' reinitiate claims refer to the four changed circumstances listed in 50 C.F.R. § 402.16(a)-

7   (d).  Plaintiffs identify the "triggers" for the EPA's duty to reinitiate consultation with respect to

8   each pesticide ingredient in the factual section of the Second Amended Complaint.  *See e.g.*, SAC

9   ¶¶ 859-68 (alleging § 402.16 triggers for the "2,4-D, salts and esters" active ingredient).

10  **III.    LEGAL STANDARD**

11        **A.    Federal Rule of Civil Procedure 12(b)(1)**

12        A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) may take the form of a

13  "facial attack" or a "factual attack."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th

14  Cir. 2004).  Where, as here, "the challenger asserts that the allegations contained in the complaint

15  are insufficient on their face to invoke federal jurisdiction," *id.*, Plaintiffs bear the burden of

16  proving that subject-matter jurisdiction exists.  *See Lanza v. Ashcroft*, 389 F.3d 917, 930 (9th Cir.

17  2004).  "If jurisdiction is lacking at the outset, the district court has no power to do anything with

18  the case except dismiss."  *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858

19  F.2d 1376, 1380 (9th Cir. 1988) (citation omitted).  "A court may consider not only the allegations

20  in the complaint in a facial attack but also documents attached to the complaint and judicially

21  noticeable facts."  *CopyTele, Inc. v. E Ink Holdings*, 962 F.Supp.2d 1130, 1135 (N.D. Cal. 2013).

22        **B.    Federal Rule of Civil Procedure Rule 12(b)(6)**

23         "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of

24  the complaint."  *N. Star. Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  In ruling

25  on a motion to dismiss under Rule 12(b)(6), courts take "all allegations of material fact as true and

26  construe them in the lights most favorable to the non-moving party."  *Parks Sch. of Bus. v.

27  Symington*, 51 F.3d 1480, 1484 (9th Cir. 1990).  To survive a motion to dismiss, "a complaint

28  must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible

United States District Court
Northern District of California

14

1    on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

2    550 U.S. 544, 570 (2007)).  "[T]he tenet that a court must accept a complaint's allegations as true

3    is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory

4    statements." *Iqbal*, 556 U.S. at 663.  The allegations in a complaint "may not simply recite the

5    elements of a cause of action, but must contain sufficient allegations of underlying facts to give

6    fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d

7    1202, 1216 (9th Cir. 2011).

8          Although a court generally may not consider materials beyond the pleadings under Rule

9    12(b)(6), a court may take judicial notice of matters of public record, *Lee v. City of Los Angeles*,

10   250 F.3d 668, 689 (9th Cir. 2001) (citation omitted), and may consider "documents whose

11   contents are alleged in a complaint and whose authenticity no party questions, but which are not

12   attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other*

13   *grounds by Galbraith v. Cnty of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also United*

14   *States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

15   **IV.    DISCUSSION**

16        **A.    Whether Plaintiffs State Claims against the EPA for Failing to Comply with
            ESA Section 7(a)(2) by Failing to Initiate Consultation with the Service**

17

18        As noted above, in each failure-to-consult claim corresponding to an active pesticide

19   ingredient, Plaintiffs identify four categories of "agency actions" which allegedly trigger the

20   EPA's duty to consult under section 7(a)(2).  *See, e.g.*, SAC ¶¶ 1569, 1579, 1589.  These

21   "actions" consist of: (1) the EPA's issuance of the RED or amended RED; (2) the EPA's

22   "continued discretionary control and involvement in this pesticide's registration," which Plaintiffs

23   allege is an "ongoing agency action"; (3) the "EPA's completion of product reregistration for this

24   pesticide"; and (4) the "EPA's approvals of products containing this pesticide."  *See, e.g., id.*

25        For each category, the Court considers whether the alleged agency action triggers the

26   EPA's duty to initiate consultation to ensure compliance with section 7(a)(2) of the ESA.

27               **1.    Issuance of the RED or Amended RED**

28        For each pesticide ingredient, Plaintiffs allege that the EPA's issuance of a RED was an

United States District Court
Northern District of California

United States District Court
Northern District of California

1  affirmative agency act that triggered the duty to consult.  *See, e.g.*, SAC ¶¶ 1569, 1579, 1589.  The

2  EPA contends that every challenge to the issuance of a RED must be dismissed because the REDs

3  were issued outside the statute of limitations and/or constitute orders following a hearing as

4  interpreted by the Ninth Circuit in *United Farm Workers*, 592 F.3d at 1082.  The Court agrees.

5       In the previous order, the Court held that the six-year statute of limitations in 28 U.S.C.

6  § 2401(a) governs Plaintiffs' claims.  *CBD v. EPA*, 2013 WL 1729573, at *22.  Because Plaintiffs'

7  complaint was filed on January 20, 2011, the Court held that agency actions occurring prior to

8  January 20, 2005 were barred by the statute of limitations.  *Id.*  In the Second Amended

9  Complaint, there are fifteen claims based in part on the EPA's issuance of REDs prior to January

10  20, 2005.[7]  Plaintiffs concede this.  *See* Opposition at 26 n. 12.  Thus, to the extent these fifteen

11  claims rely on REDs issued outside the statute of limitations as the affirmative agency act

12  triggering the EPA's duty to initiate consultation, the claims are time-barred.

13       The Court also held in the Dismissal Order that it lacked jurisdiction over Plaintiff's ESA

14  claims that are based on the EPA's registration actions that follow a notice and public comment

15  period.  *CBD v. EPA*, 2013 WL 1729573, at *18.  The Court reasoned that: (1) Plaintiff's ESA

16  claims are "inextricably intertwined" with the EPA's pesticide actions governed under FIFRA, and

17  thus are subject to FIFRA's more specific jurisdictional provisions, *American Bird*, 545 F.3d at

18  1193; (2) FIFRA § 16(b) confers exclusive jurisdiction to the court of appeals for "any order . . .

19  following a public hearing," 7 U.S.C. § 136n(b); and (3) notice in the Federal Register and an

20  opportunity for public comment constitutes a "public hearing" for purposes of FIFRA § 16(b),

21  *United Farm Workers*, 592 F.3d at 1082.

22       The EPA states that, with respect to each RED issued after January 20, 2005, the RED was

23

24  _____
    [7] This includes Plaintiff's 4th, 8th, 10th, 14th, 16th, 17th, 18th, 19th, 22nd, 23rd, 24th,
25  27th, 28th, 30th and 31st causes of action.  Respectively, these causes of action correspond to the
    following paragraph in the Second Amended Complaint, pesticide ingredient, and date of RED
26  issuance: ¶ 1599 (alachlor, 1998 RED); ¶ 1639 (captan, RED 2004); ¶ 1659 (chlorthalonil, RED
    1999); ¶ 1699 (diuron, RED 2003); ¶ 1719 (MCPA, salts and esters, RED 2004); ¶ 1729
27  (methomyl, RED 1998); ¶ 1739 (metolachlor and isomers, RED 1994); ¶ 1749 (metribuzin, RED
    1997); ¶ 1779 (oxyfluorfen, RED 2002); ¶ 1789 (paraquat dichloride, RED 1997); ¶ 1799
    (pendimethalin, RED 1997); ¶ 1829 (propanil, RED 2003); ¶ 1839 (propargite, RED 2001);
28  ¶ 1859 (thiobencarb, RED 1997); ¶ 1869 (trifluralin, RED 2004).

16

United States District Court
Northern District of California

1    issued after a notice was provided in the Federal Register and public comment was solicited. The

2    EPA attaches Exhibit A to its motion brief, which reflects a table listing these REDs, as well as the

3    citation to the Federal Register demonstrating that a notice and comment period took place. *See*

4    *e.g.*, 71 Fed. Reg. 66518 (Nov. 15, 2006) (seeking public comment for the EPA's new risk

5    assessment for Acephate); 70 Fed. Reg. 76820 (Dec. 28, 2005) (seeking public comment for the

6    EPA's new risk assessment for Dicamba & salts).

7         Plaintiffs do not challenge the EPA's representation that these notice and comment periods

8    reflected in Exhibit A took place with respect to the EPA's issuance of the REDs. Therefore,

9    Plaintiffs have not demonstrated subject matter jurisdiction over claims arising from the EPA's

10    issuance of a RED. *Lanza*, 389 F.3d at 930. Accordingly, to the extent any claims under section 7

11    of the ESA rely on the issuance of a RED or an amended RED as the affirmative agency act

12    triggering the EPA's duty to consult, those claims are dismissed for lack of subject matter

13    jurisdiction, without leave to amend.

14             **2.**      **Ongoing Agency Action**

15         The Court next addresses Plaintiffs' contention that the EPA's "continued discretionary

16    control and involvement in this pesticide's registration," which Plaintiffs state is an "ongoing

17    agency action," triggers the EPA's duty to consult. In the previous Dismissal Order, the Court

18    rejected Plaintiffs' contention that "continued discretionary control" is sufficient to trigger an

19    agency's duty to initiate consultation under § 7(a)(2). *CBD v. EPA*, 2013 WL 1729573, at *9. To

20    the extent Plaintiffs base their claims on arguments previously rejected by this Court, Plaintiffs

21    have failed to adhere to Civil Local Rule 7-9 governing motions for reconsideration. *See Gwin v.*

22    *Target Corp.*, No. 12-5995 JCS, 2014 WL 651864, at *13 (N.D. Cal. Feb. 19, 2014). The Court

23    declines to repeat its reasoning with respect to those arguments.

24         Plaintiffs do, however, present their "ongoing agency action" argument with a new twist.

25    Plaintiffs contend the Dismissal Order "may also be interpreted as requiring Plaintiffs to identify

26    *further affirmative actions* in order to provide an adequate showing of ongoing agency action."

27    Opposition at 11 (emphasis added). Plaintiffs cite the Ninth Circuit in *Karuk Tribe*: "Where

28    private activity is proceeding pursuant to a vested right or to a previously issued license, an agency

1    has no duty to consult under Section 7 if it takes no *further affirmative action* regarding the

2    activity." *Karuk Tribe*, 681 F.3d at 1021 (emphasis added).

3           Plaintiffs argue that they have cured the defects in their previous complaint by alleging

4    "further affirmative action regarding the activity." While designating the underlying agency

5    action as the EPA's issuance of a RED, Plaintiffs allege that the EPA undertook "further

6    affirmative actions" to show that the agency action is "ongoing agency action." For instance, with

7    respect to the pesticide ingredient 1,3-dichloropropene, Plaintiffs state that:

8                EPA issued "Soil Fumigant Risk Assessments" in 2010, initiated
            reregistration review for 1,3-dichloropropene in 2013, published an
9                Updated RED Fact Sheet (that includes additional mitigation
            measures beyond those in the 1998 RED) in 2008, completed
10               product reregistration in 2008, and approved various individual
            product labels.

11   Opposition at 10. Plaintiffs contend that these "further affirmative actions" provide "an adequate

12   showing of ongoing agency action," and trigger the "ongoing duty to consult." Opposition at 10.

13          Plaintiffs' argument is based on a misreading of the Ninth Circuit's decision in *Karuk*

14   *Tribe*. The use of the words "affirmative actions" in *Kurok Tribe* referred to actions which, in

15   their own right, triggered a duty to consult. There is no indication that the court was referring to a

16   mere aggregation of acts that otherwise would not be sufficient to trigger the duty. To the extent

17   Plaintiffs argue that these actions constitute an agency action in its own right, the Court addresses

18   the issues below.

19          The Court also rejects Plaintiffs' contention that the Court's previous order created an

20   "inconsistency" with respect to the legal standard for failure-to-consult and reinitiate claims.

21   Plaintiffs believe it is inconsistent to find that ongoing agency action is irrelevant to the failure-to-

22   consult analysis, while simultaneously recognizing an agency's ongoing duty to ensure that

23   agency actions do not jeopardize endangered species, as reflected by their duty to reinitiate

24   consultation when the factors in 50 C.F.R. 402.16 are satisfied. *See* Opposition at 11-12.

25          First, Plaintiffs mischaracterize the Dismissal Order to the extent they say the Court held

26   that "ongoing agency action" is irrelevant to the to the failure-to-consult analysis. *See* Opposition

27   at 11. In the Dismissal Order, the Court specifically acknowledged that an affirmative agency

28   action can be ongoing. *CBD v. EPA*, 2013 WL 1729573, at *10 ("The 'ongoing construction and

United States District Court
Northern District of California

1    operation of a dam,' for example, is sufficient to trigger consulting obligations because the

2    operation of a dam is an affirmative act." (quoting *Karuk Tribe*, 681 F.3d at 1021 (citing *Tenn.*

3    *Valley Auth. v. Hill*, 437 U.S. 153, 173-74 (1978)))).  The Court held that while the operation of a

4    dam is an affirmative act, the retention of discretionary control over previously issued pesticide

5    licenses is not.  *See id.*

6          The retention of discretionary control is necessary but insufficient to trigger an agency's

7    duty to both reinitiate consultation and initiate consultation.  *See* 50 C.F.R. §§ 402.03, 402.16;

8    *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665-66 (2007); *Karuk Tribe*,

9    681 F.3d at 1021.  In addition to this requirement, there are distinct triggers for an agency's duty

10   to initiate consultation and reinitiate consultation.  An agency must initiate formal consultation

11   when the agency determines than an action "may affect listed species or critical habitat."  50

12   C.F.R. § 402.14(a).  After a formal consultation has occurred with respect to an agency action, the

13   EPA must reinitiate formal consultation with respect to the original action when one of the triggers

14   in 50 C.F.R. § 402.16 occurs.  An agency violates section 7(a)(2) of the ESA when it fails to

15   initiate consultation upon its determination that an action "may affect listed species or critical

16   habitat," 50 C.F.R. § 402.14(a), *or* when an agency fails to reinitiate consultation when one of the

17   triggers in 50 C.F.R. § 402.16 occurs.

18         The distinctive standards triggering the duties to initiate and reinitiate consultation are not

19   inconsistent; they are comprehensive.  Agencies must initiate consultation when the agency

20   determines that an agency action "may affect listed species or critical habitat."  50 C.F.R.

21   § 402.14(a).  Agencies may also be required to reinitiate consultation when circumstances change

22   after the initial formal consultation.  *See* 50 C.F.R. § 402.16 (duty to reinitiate may be triggered

23   when there is new information, a modification to the agency action, new species and habitat are

24   listed, or when the specified "take" is exceeded).  The fact an agency must reinitiate consultation

25   when the factors in 50 C.F.R. § 402.16 are met "insure[s]" that an agency action "is not likely to

26   jeopardize" listed species or critical habitat after the initial formal consultation. 16 U.S.C.

27   § 1536(a)(2).

28

United States District Court
Northern District of California

### 3.     Completion of Product Reregistration for each Pesticide

Plaintiffs allege that the "completion of product reregistration" for each pesticide constitutes an affirmative agency act triggering the duty to consult. *See, e.g.*, SAC ¶¶ 1569, 1579, 1589.   However, as the EPA correctly points out, the "completion of product reregistration is not an affirmative action of any sort; it is a fact."  EPA Br. at 16.  The EPA acts when it reregisters a pesticide product.

Plaintiffs make no argument challenging the EPA's assertion that the "completion" of product reregistration is a mere fact.  Plaintiffs write that, "from a practical standpoint, it seems that the overall process of product registration for each pesticide would be a more logical action on which to consult than the numerous individual product reregistrations."  Opposition at 19 n. 8.  That may be true.  Moreover, it is likely that the agency may fulfill its consultation obligations by consulting on more than one action at a time.  However, those obligations are triggered by an individual agency action, not by the "completion" of a group of actions—unless that group is an "action" for purposes of the ESA.  Accordingly, Plaintiffs may not base their failure-to-consult claims on the EPA's "completion" of product reregistration—as opposed to the actual registration actions—for products containing a particular active ingredient.

### 4.     EPA's Reregistrations of Products containing the Pesticide

#### i.     Whether Pesticide Product Reregistrations Constitute an Affirmative Agency Act

Whether the EPA's post-RED reregistration of pesticide products constitutes an "agency action" under section 7 must be considered within the framework of *Karuk Tribe*'s two-part test:

> First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity.  Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species.

*Karuk Tribe*, 681 F.3d at 1021.  The Ninth Circuit has instructed that "the ESA's use of the term 'agency action' is to be construed broadly."  *Id*.  Indeed, "[t]he consultation requirement reflects 'a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies.' " *Id*. at 1020 (quoting *Tenn. Valley Auth.*, 437 U.S. at 185).

United States District Court
Northern District of California

1    First, Plaintiffs have sufficiently alleged that the EPA affirmatively authorized, funded,

2  and carried out pesticide product reregistrations with respect to each pesticide ingredient.  *Karuk*

3  *Tribe*, 681 F.3d at 1021.  For each active pesticide ingredient, Plaintiffs provide a table of the

4  products containing the active pesticide ingredient.  *See, e.g.*, SAC ¶¶ 119-120 (table listing

5  products containing 1,3-dichloropropene), ¶¶ 144-45 (table listing products containing 2,4-D, Salts

6  and Esters).  Alongside the name of each pesticide product, the table lists the product's

7  reregistration number and date of reregistration.  *See id.*  Because "agency action" is to be

8  construed broadly, and includes "the approval and registration of pesticides," *Karuk Tribe*, 681

9  F.3d at 1021 (citing *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1031–33 (9th Cir.

10  2005)), Plaintiffs have sufficiently alleged an affirmative agency action in the EPA's reregistration

11  of products.

12    Second, Plaintiffs have also alleged that the EPA has "discretionary Federal involvement

13  or control."  50 C.F.R. § 402.03; *see* SAC ¶ 1567.  This requirement considers whether the EPA

14  had discretion to decide whether to reregister pesticide products containing, for example,

15  1,3-dicloropropene.  *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644

16  (2007) ("This reading harmonizes the statutes by applying § 7(a)(2) to guide agencies' existing

17  discretionary authority, but not reading it to override express statutory mandates.").  This

18  requirement also considers whether EPA has "the capacity to inure to the benefit of a protected

19  species."  *Karuk Tribe*, 681 F.3d at 1024 (citing *Turtle Island Restoration Network v. Nat'l Marine*

20  *Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003) ("If no discretion to act is retained, then

21  consultation would be a meaningless exercise.")).

22    When determining whether to reregister a pesticide, the EPA exercises discretion in a

23  series of determinations reflected in 7 U.S.C. § 136a(c)(5).  With respect to each pesticide product,

24  the EPA determines whether:

25    (A) its composition is such as to warrant the proposed claims for it;

26    (B) its labeling and other material required to be submitted comply
27    with the requirements of this subchapter;

28

1

2

> (C) it will perform its intended function without unreasonable
> adverse effects on the environment; and
>
> (D) when used in accordance with widespread and commonly
> recognized practice it will not generally cause unreasonable adverse
> effects on the environment.

7 U.S.C. § 136a(c)(5); *see also id.* § 136a-1(g)(2)(C) ("The Administrator shall determine whether

to reregister a pesticide by determining whether such pesticide meets the requirements of section

136a(c)(5) of this title.").  While the EPA is required to undertake these determinations, the EPA

exercises its discretion when determining whether the foregoing factors are met, and ultimately,

whether or not to reregister the pesticide.  Accordingly, there is "discretionary Federal

involvement or control" over the pesticide product reregistrations.  50 C.F.R. § 402.03.

   Accordingly, the Court finds that Plaintiffs have sufficiently alleged affirmative agency

actions in the EPA's reregistration of pesticide products, and that the EPA retains discretionary

control over such product reregistrations.

### ii.    Whether the Challenges to Product Registrations are Collateral Attacks on the EPA's Issuance of REDs

   Plaintiffs allege that the EPA's "approval of products containing" the challenged active

pesticide ingredients do "not follow a hearing and are therefore judicially reviewable by the

district court under FIFRA § 16(a), 7 U.S.C. § 136n(a)."  SAC ¶ 123.  Defendants do not

challenge Plaintiffs' allegation that there is no notice and comment period prior to the EPA's

approval of pesticide products.  Therefore, it appears that review over EPA's reregistration of

pesticide products falls within the scope of FIFRA section 16(a), as opposed to the issuance of a

RED for the active pesticide ingredient, which generally follows a notice and comment period.

*See* 7 U.S.C. § 136n; *United Farm Workers*, 592 F.3d at 1082.

   Moreover, the tables in the Second Amended Complaint only list pesticide products that

were reregistered after January 20, 2005.  *See, e.g.*, ¶¶ 120, 145.  Therefore, the six-year statute of

limitations in 28 U.S.C. § 2401(a) would not bar Plaintiffs claims.[8]

---

[8] However, any claim based on the product reregistration actions taken before that date are time barred.

22

1   Nevertheless, Defendants contend that Plaintiffs' challenge to the post-RED product

2   approvals amounts to an improper "collateral attack" on the REDs.  The EPA contends that, "like

3   a direct challenge to the REDs themselves," Plaintiffs' challenge to the post-RED product

4   approvals is barred by FIFRA section 16(b) and the six-year statute of limitations in 28 U.S.C.

5   § 2401(a).  EPA Br. at 16.  Accordingly, the Court decides whether jurisdiction to review the

6   EPA's reregistration of pesticide products, which would normally be in district court under FIFRA

7   § 16(a), is nonetheless exclusively conferred on the court of appeals under FIFRA section 16(b)

8   because the challenge to the product reregistrations is an improper collateral attack on the REDs.

9   The Supreme Court discussed improper collateral attacks in *City of Tacoma v. Taxpayers*

10  *of Tacoma*, 357 U.S. 320 (1958).  That case involves a FERC license issued to the City of Tacoma

11  ("City") to construct a power facility on the Cowlitz River, which FERC granted despite

12  Washington State's ("State") contention that the project could not be built without its approval.

13  After the FERC issued the license to the City over the State's objections, the State appealed the

14  decision to the Ninth Circuit under section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b),

15  which grants the court of appeals "exclusive jurisdiction" to review orders issued by FERC.  *City*

16  *of Tacoma*, 357 U.S. at 327.  Section 313(b) of the Federal Power Act also provides that the court

17  of appeals review and judgment of the FERC's orders "shall be final" and subject to "review by

18  the Supreme Court . . . ."  *Id*. at 335.

19  While the State's petition was pending in the Ninth Circuit, the City filed an action in

20  superior court seeking a judgment declaring valid the City's issuance of revenue bonds to fund the

21  project.  *Id*. at 329.  The State filed a cross-complaint in this action "reasserting substantially the

22  same objections that they and the State had made before the Commission, and that had been made

23  in, and rejected by, the Court of Appeals on their petition for review . . . ."  *Id*.  Addressing the

24  merits of the issue, the Washington Supreme Court held that the City could not proceed with the

25  project because the City had no right, acting under the FERC license, to condemn state-owned

26  property.  *Id*. at 333.

27  The United States Supreme Court reversed the Washington Supreme Court's decision

28  because the State's challenges to the project in superior court were "impermissible collateral

23

1    attacks upon . . . the final judgment of the Court of Appeals." *Id*. at 334.  The Court held that

2    section 313(b) of the Federal Power Act, which places exclusive jurisdiction in the Court of

3    Appeals and make the court's decisions "final" and subject to review by the United States

4    Supreme Court, "necessarily precluded *de novo* litigation between the parties of all issues inhering

5    in the controversy and all other modes of judicial review." *Id*. at 336.  The Court continued:

6    "upon judicial review of the Commission's order, all objections to the order, to the license it

7    directs to be issued, and to the legal competence of the licensee to execute its terms, must be made

8    in the Court of Appeals or not at all." *Id*.

9         In so holding, the Court noted that the State "participated in the hearing before the

10   Commission" where it "vigorously objected to the issuance of the license." *Id*. at 337.  The Court

11   further recognized that "the very issue upon which respondents stand here was raised and litigated

12   in the Court of Appeals and decided by its judgment." *Id*. at 339.  Nevertheless, the Court did not

13   decide the case on grounds of res judicata or collateral estoppel.  *See id.* at 336-37 (noting that

14   "statutory finality need not be labeled res judicata, estoppel, collateral estoppel, waiver or the like

15   by either Congress or the courts").  Rather, the Court wrote that "even if it might be thought that

16   this issue was not raised in the Court of Appeals, it cannot be doubted that it could and should

17   have been, for that was the court to which Congress had given 'exclusive jurisdiction to affirm,

18   modify, or set aside the Commission's order.' " *Id*. at 339.

19        The Ninth Circuit addressed the question of whether a challenge to an agency order may be

20   an improper collateral attack on a prior agency action.  In *Pacific Gas & Electric v. FERC*, 464

21   F.3d 861 (9th Cir. 2006) the court stated:

22
23              To determine whether a petition for review is barred as a collateral
                attack on a prior order, we must determine whether the order upon
24              which the petition is based "was merely a clarification of a prior
                order, or whether it was a modification of a prior order." . . . The
25              latter is reviewable on appeal, while review of the former is barred
                as an impermissible collateral attack.  To differentiate between a
26              clarification and a modification, we ask "whether a reasonable party
                in the petitioner's position would have perceived a very substantial
27              risk that the original order meant what the Commission now says it
                meant."
28

United States District Court
Northern District of California

1    *PG & E*, 464 F.3d at 868-69 (quoting *Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589 (D.C. Cir.

2    2002) (alterations omitted)).

3           In *PG & E*, the Ninth Circuit held it "lack[ed] subject matter jurisdiction to entertain PG &

4    E's petition for review because it is an impermissible collateral attack on a prior FERC order"

5    issued in a "Refund Proceeding." *PG & E*, 464 F.3d at 863.  The court reasoned that when FERC

6    entered the subsequent order that was challenged by PG & E, "FERC simply clarified and

7    implemented its previous order in the Refund Proceeding.  It did not substantively alter the

8    meaning or scope of its order in the Refund Proceeding." *Id*. at 869.  While noting that it had

9    exclusive jurisdiction to review petitions from aggrieved parties under section 313(b) of the

10   Federal Power Act, the court wrote: "Our jurisdiction, however, is limited to review of new orders.

11   We may not entertain a petition for review that collaterally attacks a prior FERC order." *Id*. at 868

12   (citing *Pub. Util. Dist. No. 1 of Grays Harbor Cnty. Wash. v. IDACORP Inc.*, 379 F.3d 641, 652

13   (9th Cir. 2004) ("Under the FPA, a party aggrieved by a FERC order must obtain review of that

14   order by petitioning the court of appeals; that party cannot attack the order by way of a new

15   lawsuit in federal court.")).  As a final point, the court noted that it was "clear that PG & E raised

16   the same concerns in the Refund Proceeding that it raises in the petition for review . . . ." *Id*. at

17   870.

18          In this case, to determine whether Plaintiffs' challenge to the post-RED product approvals

19   amounts an improper collateral attack on the REDs, the Court first considers the statutory

20   framework under which pesticide products are reregistered.  The ultimate objective of the

21   reregistration program, which ends not with the RED but with a number of steps after the RED,  is

22   for the EPA to "*reregister . . . each* registered *pesticide* containing any active ingredient contained

23   in any pesticide first registered before November 1, 1984 . . . ." 7 U.S.C. § 136a-1(a) (emphasis

24   added).  In addition to issuing the RED under § 136a-1(g)(2)(A), the EPA must solicit "product-

25   specific data regarding the pesticide . . . ." *Id.* § 136a-1(g)(2)(B)(i).  This data must be considered

26   when determining whether each pesticide product complies with the Paragraph 5 Requirements.

27   *See id.* § 136a-1(g)(2)(C).

28          It is not dispositive that the EPA considers the RED to be the most important step in this

United States District Court
Northern District of California

United States District Court
Northern District of California

1    process:  the EPA's website states that product reregistration is merely "the EPA's program for

2    *implementing* reregistration eligibility decisions by ensuring that required risk reduction measures

3    are reflected on pesticide product labels."[9]  The EPA cites no law to demonstrate that the product

4    reregistrations should be so insignificant.  Statutorily required proceedings that occur after the

5    RED—including the gathering and analysis of product specific data and a determination of

6    whither the pesticides at issue comply with the Paragraph 5 requirements—cannot be so lightly

7    disregarded.  Defendants are incorrect when they argue that "the RED represents EPA's final

8    determination as to an active ingredient's compliance with FIFRA § 3(c)(5)'s registration

9    requirements."  EPA Br. at 19; *see also* Intervenors Br. at 9-10 (noting that the EPA determines

10   "whether an active ingredient continues to meet the registration standard" in 7 U.S.C.

11   § 136a(c)(5)).  FIFRA indicates that only the pesticide products will be evaluated under the

12   Paragraph 5 Requirements.  *See id.* § 136a-1(g)(2)(C).  As to the RED, there are no specific

13   standards defined in the statute, *see* § 136a-1(g)(2)(A), and Congress did not authorize EPA to

14   promulgate regulations under § 136a-1.[10]  Under the statutory framework of FIFRA, the issuance

15   of a RED is an interim step in the process of reregistering the pesticide products.  Thus, the Court

16   will not hold that, as a matter of law, an attack on a post-RED product reregistration is a collateral

17   attack on the RED.

18          Turning to Plaintiffs' allegations, however, the Court agrees with Defendants that the

19   Second Amended Complaint does not identify any facts that demonstrate the product

20   reregistrations raised any new issues regarding the EPA's compliance with section 7 of the ESA

21   that could not have been raised in a timely challenge to the EPA's issuance of a RED.  The

22   question is whether they must when the reregistration of pesticide products was the final act of the

23   reregistration program created by Congress.  *See id.* § 136a-1(g)(2)(C).

24          Plaintiffs attempt to distinguish this case from *PG & E*, where the Ninth Circuit held that

25   PG & E lodged a collateral attack on a prior order in a Refund Proceeding.  *PG&E*, 464 F.3d at

26

27          [9] http://www.epa.gov/pesticides/reregistration/product-reregistration.htm

28          [10] By contrast, Congress expressly delegated authority to the EPA to "establish a procedure
     for accomplishing the periodic review of registrations."  7 U.S.C. § 136a(g)(1)(A)(ii).

1    868-70.  The Refund Proceeding was established to investigate the spike in energy prices in

2    California, and in particular, the "justness and reasonableness of the rates for all sales" in the

3    exchanges run by a non-profit entity, California Independent System Operator ("Cal-ISO").

4    *PG&E*, 464 F.3d at 864-65.  As part of the Refund Proceeding, the FERC established a "mitigated

5    market clearing price ("MMCP"), which estimated what the market price for energy would have

6    been in a competitive market."  *Id*. at 865.  The FERC also "ordered Cal-ISO to rerun . . . past

7    invoices, to reflect what they would have been had consumers been charged the MMCP," which

8    would enable "FERC to calculate the refunds owed to California consumers."  *Id*.

9         PG & E did not petition for the review of this order in the Refund Proceeding.  Rather, PG

10   & E petitioned for review of a subsequent FERC order granting an amendment proposed by Cal-

11   ISO to re-run past invoices using an accounting method (hereafter, "Method") by which "only

12   those parties who caused the energy imbalances would bear the expense of balancing the grid." *Id*.

13   at 866.  The Ninth Circuit held that when FERC approved the Method,

14              FERC simply clarified and implemented its previous order in the
              Refund Proceeding.  From FERC's explicit adoption of the ALJ's
15              findings, a reasonable party in PG&E's position should have known
              that the [Method] was to apply to the re-run.  Thus, to challenge
16              FERC's approval of the [Method], PG & E's only option was to
              petition for review of the order entered in the Refund Proceeding.
17              PG & E cannot obtain two bites of the proverbial apple by
              petitioning for review here as well.
18

19   *Id*. at 869.

20         Plaintiffs attempt to distinguish *PG & E* on the basis that the post RED actions in this case

21   are not "merely a clarification" of the prior order.  Opposition at 24.  The Ninth Circuit has

22   established a test in *PG&E* to determine whether a subsequent agency order is a "clarification" or

23   a "modification."  In that case, the court found that "PG&E *should have perceived a very*

24   *substantial risk* . . . from FERC's order in the Refund Proceeding" that the reallocation would

25   occur.  *Id*. at 869-70 (emphasis added) (citing *Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589-90

26   (D.C. Cir. 2002)).  The Ninth Circuit wrote that "[t]he fact that the [subsequent order] may be

27   more detailed than the order in the Refund Proceeding does change the fact that they clarified—

28   not modified—the Refund Proceeding order and PG & E's expectations."  *Id*. at 870.

United States District Court
Northern District of California

Here, to the extent that Plaintiffs seek to challenge any of the analyses or conclusions contained in the RED, this court has no jurisdiction to entertain such a claim.  Moreover, to the extent that, from those analyses and conclusions the parties "should have perceived a very substantial risk" that any new decisions raised by post RED proceedings would be implemented, such subsequent determinations are "clarifications" of the prior RED and are not subject to challenge here.

Any other conclusion would undermine the exclusive jurisdiction of the court of appeals established by §16(b).  If an aggrieved party could challenge the conclusions of the RED just because they were implemented in a subsequent order, as a practical matter there would be no exclusive jurisdiction in the court of appeals to consider challenges to the RED.

However, the SAC fails to identify which issues raised by the post RED acts triggered a duty to consult.  Accordingly, on this record, the court cannot determine whether the post RED product reregistration actions "substantially alter[ed] the meaning or scope" of the REDs.  What is clear is what cannot be challenged: analyses and conclusions made in the RED.  What is being challenged here is less clear.

Accordingly, the Court will give Plaintiffs an opportunity to amend to cure this failing.

**B.      Whether Plaintiffs State Claims against the EPA under ESA Section 7(a)(2) by Failing to Reinitiate Consultation with the Service**

The Court now considers whether Plaintiffs' have sufficiently pled claims against the EPA for violating section 7 of the ESA by failing to reinitiate consultation with respect to certain pesticides addressed in the 1989 and 1993 Biological Opinions.  The EPA and Intervenors present two main arguments relating to Plaintiffs' reinitiate claims.[11]  Both the EPA and Intervenors contend that Plaintiffs failed to identify an appropriate agency action.  Intervenors also contend

_____

[11]  Plaintiffs state that Defendants have asserted three arguments, noting that Intervenors write the following in their brief: "Plaintiffs also may not collaterally attack the REDs by using the reinitiation regulation as a vehicle to plead around the jurisdictional requirements of FIFRA any more than they could circumvent those requirements as to their consultation claims."  Intervenor Br. at 15.  To the extent this is an actual argument, it is rejected because Plaintiffs may assert claims under section 7 of the ESA which challenge an agency's failure to reinitiate consultation. *See* 16 U.S.C. §§ 1536(a)(2), 1540(f), 1540(g)(1)(A); 50 C.F.R. § 402.16.

that 50 C.F.R. § 402.16, the regulation that lists the four changed circumstances which trigger an agency's duty to reinitiate consultation, is not binding on the EPA.  Although the Court finds that the regulation is binding on the EPA, the Court agrees that, with respect to many of the pesticides at tissue, Plaintiffs have failed to identify an agency action that gives rise to a duty to reinitiate consultation: the actions on which the EPA initially consulted with the Service have been superseded by reregistration, and Plaintiffs have not identified any consultation on the more recent actions that could be reinitiated.  Those claims are dismissed with prejudice.

On the other hand, with respect to certain pesticides at issue, the SAC does not indicate that they have been reregistered—even where a RED or similar reregistration event has occurred for the active ingredients.  As to those pesticides, in the absence of reregistration, the original reregistration has not been superseded, and the plaintiffs have adequately pleaded events triggering a duty to reinitiate consultation.

### 1.    *Chevron* Deference should be Accorded to 50 C.F.R. § 402.16

Section 7(a)(2) of the ESA provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize" endangered species or critical habitat.  16 U.S.C. § 1536(a)(2).  In 1986, the Secretary promulgated regulations that, *inter alia*, define the consultation process required by section 7 of the ESA.  *See, e.g.*, 50 C.F.R. § 402.02 (defining "agency action" to include "all activities or programs of any kind authorized, funded or carried out . . . by Federal agencies"); 50 C.F.R. § 402.14 (requiring formal consultation if a federal agency determines that an agency action "may affect listed species or critical habitat").  The regulation supporting Plaintiffs' reinitiate claims provides as follows:

> *Reinitiation* of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
>
> (a) If the amount or extent of taking specified in the incidental take statement is exceeded;

United States District Court
Northern District of California

29

1

2

       (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

3

4

       (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

5

6

       (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

7

50 C.F.R. § 402.16 (emphasis added).

8

       On more than one occasion, the Supreme Court has recognized that " '[t]he latitude the

9

ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise

10

necessary to its enforcement, establishes that [courts] owe some degree of deference to the

11

Secretary's reasonable interpretation' of the statutory scheme." *Nat'l Ass'n of Home Builders v.*

12

*Defenders of Wildlife*, 551 U.S. 644, (2007) (quoting *Babbitt v. Sweet Home Chapter,*

13

*Communities for Great Ore.*, 515 U.S. 687, 703 (1995) (citing *Chevron U.S.A. v. Natural*

14

*Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984))). In *Home Builders*, the Court held

15

that 50 C.F.R. § 402.03, which limits section 7(a)(2)'s applicability to agency "actions in which

16

there is discretionary Federal involvement or control," *id.*, was a reasonable interpretation of

17

section 7 of the ESA and "entitled to deference under *Chevron*." *Home Builders*, 551 U.S. at 665.

18

Similarly, the Court's decision in *Sweet Home* focused on the reasonableness of 50 C.F.R. § 17.3,

19

which defines the ESA's prohibitions against takings to include critical habitat in addition to

20

endangered species. *Sweet Home*, 515 U.S. 687.

21

       The Ninth Circuit has also accorded deference to the Service's regulations implementing

22

section 7 of the ESA. In *Conservation Congress v. U.S. Forest Service*, to determine whether

23

cumulative effects of an agency action must be considered during an informal consultation, the

24

Ninth Circuit deferred to the Service's distinctive rules for formal and informal consultations. 720

25

F.3d 1048, 1055-56 (9th Cir. 2013). While consideration of the cumulative effects of an agency

26

action in formal consultation is required, *see* 50 C.F.R. § 402.14(g), the same is not true for

27

informal consultation, which is "an optional process . . . designed to assist the Federal agency in

28

30

determining whether formal consultation . . . is required." 50 C.F.R. § 402.13.  The Ninth Circuit

relied on these regulations when holding that cumulative effects need not be considered in an

informal consultation.  *Conservation Congress*, 720 F.3d at 1055-56; *see also Cal. River Watch v.*

*Wilcox*, 633 F.3d 766, 776 (9th Cir. 2011) ("The FWS . . . has the authority to interpret the ESA in

rules carrying the force of law.").

      The Ninth Circuit has specifically accorded deference to determinations of the Service

under the regulation that requires federal agencies to reinitiate consultation when the

circumstances in 50 C.F.R. § 402.16 are present.[12] *See Sierra Club v. Marsh*, 816 F.2d 1376 (9th

Cir. 1987).  In *Sierra Club*, the Army Corps of Engineers ("COE") agreed during a formal

consultation with FWS to dedicate certain mitigation lands to offset the take associated with a

COE project.  When the COE was unable to dedicate the mitigation lands (as had previously been

assumed), the court found that under 50 C.F.R. § 402.16(b), there was "new information" that

reveals effects of the action "not previously considered."  *Sierra Club*, 816 F.2d at 1388 (quoting

§ 402.16(b)).  The COE's duty to reinitiate consultation had been triggered.  The Ninth Circuit

wrote: "In holding as we do, we *defer* to the agency with the more appropriate expertise." *Id*.

(emphasis added).

      Intervenors contend that 50 C.F.R. § 402.16 is "not binding on EPA and . . . not judicially

enforceable."  Intervenors Br. at 18.  Notably, the EPA has made no such argument in this case.

By framing the issue as whether the EPA is "bound" by § 402.16, Intervenors attempt to

circumvent the foregoing precedent according deference to the Service's regulations issued under

section 7 of the ESA.  Intervenors do not contend that 50 C.F.R. § 402.16 should not be accorded

*Chevron* deference.  Intervenors make no argument relating to *Chevron* deference at all, despite

---

    [12]  The Ninth Circuit has also relied on 50 C.F.R. § 402.16 in cases where deference was
not specifically discussed.  *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d
1220, 1229 (9th Cir. 2008) ("Consultation under § 7 must be reinitiated where . . . discretionary
federal involvement or control has been retained or authorized; and [one of the triggers in 50
C.F.R. § 402.16 occurs]"); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d
1059, 1077 *amended*, 387 F.3d 968 (9th Cir. 2004) ("If the data is new and the new data may
affect the jeopardy or critical habitat analysis, then the FWS was obligated to reinitiate
consultation pursuant to 50 C.F.R. § 402.16.").

the emphasis on *Chevron* in Plaintiffs' opposition brief.  Nevertheless, Intervenors raise an issue that should be addressed within the framework of *Chevron* and its progeny.

Although the Ninth Circuit has accorded deference to 50 C.F.R. § 402.16 in previous circumstances, *see Sierra*, 816 F.2d 1388, the court in *Sierra Club* never specifically considered the issue Intervenors raise here: whether *the Service* has authority to promulgate § 402.16, which states the circumstances under which another agency's duty to reinitiate consultation is triggered. Indeed, at least one scholarly article has noted that "ESA's Section 7 consultation process" is "perhaps the best example" of "indirect inter-agency regulation."  Eric Biber, *Too Many Things to Do: How to Deal with the Dysfunctions of Multiple-Goal Agencies*, 33 Harv. Envtl. L. Rev. 1, 52-59 (2009).  Accordingly, the Court considers whether the Service had the authority to promulgate § 402.16's mandate that the EPA reinitiate consultation when certain circumstances are met.

The first question is whether "Congressional intent regarding the meaning of the text in question is clear from the statute's plain language."  *River Watch*, 633 F.3d at 772.  Section 7(a)(2) provides that "[e]ach Federal agency shall, *in consultation with* and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize" endangered species and critical habitat.  16 U.S.C. § 1536(a) (emphasis added). Notably, the phrase "in consultation with" does not suggest any number of consultations that are required to comply with section 7's obligations.  The statute is silent and ambiguous as to what satisfies the "in consultation with" requirement.

The Court next considers whether the regulation comports with the requirements set forth in *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  The Court must determine whether "Congress clearly delegated authority to the agency to make rules carrying the force of law," and whether "the agency interpretation was promulgated in the exercise of that authority."  *River Watch*, 633 F.3d at 772 (citing *Mead Corp.*, 533 U.S. at 226-27).  The first question is satisfied in this case because, when enacting the ESA, Congress authorized the Secretary "to promulgate such regulations as may be appropriate to enforce" the ESA.  16 U.S.C. § 1540(f).  The second question requires further analysis.

United States District Court
Northern District of California

1    While Intervenors avoid any mention of *Chevron* and its progeny, Intervenors still rely on

2    its principles by contending that "[b]ecause Congress did not place the Services in charge of

3    determining ESA Section 7 compliance, the Service cannot adopt rules that dictate or change what

4    ESA Section 7 requires." Intervenors Br. at 19. In essence, this is an argument that the Service

5    exceeded its authority by promulgating regulations which require federal agencies to initiate and

6    reinitiate consultation under certain circumstances.[13]

7    Intervenors' argument is not without support. As Intervenors point out, four Supreme

8    Court Justices have acknowledged that Congress gave the Secretary relatively less controlling

9    authority with respect to section 7 of the ESA than the other sections:

10            Whereas in other contexts the ESA is quite explicit as to the
            Secretary's controlling authority, *see, e.g.,* 16 U.S.C. § 1533(a)(1)
11          ("The Secretary shall" promulgate regulations determining
            endangered species); § 1535(d)(1) ("The Secretary is authorized to
12          provide financial assistance to any State"), with respect to
            consultation the initiative, and hence arguably the initial
13          responsibility for determining statutory necessity, lies with the
            agencies ("*Each Federal agency shall,* in consultation with and with
14          the assistance of the Secretary, insure that any" funded action is not
            likely to jeopardize endangered or threatened species) (emphasis
15          added)).
16

17   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568-69 (1992) (quoting 16 U.S.C. § 1536(a)(2)).

18   Nevertheless, the plurality in *Defenders of Wildlife* did not discuss this issue within the framework

19   of *Chevron*.[14] And, it is clear that in enacting the ESA, Congress did not authorize each federal

20   _____

21   [13] The cases Intervenors cite in support of this proposition are distinguishable. *See Adams
     Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990) (declining to defer to Department of Labor's
22   regulation under the Migrant and Seasonal Agricultural Protection Act where Congress only
     delegated the Department limited, specific authority to promulgate the statute's motor vehicle
     provisions); *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-06 (1979) (withholding *Chevron*
23   deference where agency relies on grant of authority in executive order); *Washington Toxics Coal.
     v. U.S. Dep't of Interior*, 457 F.Supp.2d 1158, 1179 (W.D. Wash. 2006) (invaliding portion of
24   EPA's counterpart regulations promulgated under 50 C.F.R. § 402.04 through which EPA sought
     to fulfill section 7 obligations by consulting with itself instead of the Service); *see also* 50 C.F.R.
25   § 402.04; *Gonzales v. Oregon*, 546 U.S. 243, 257-58 (2006) (declining to defer to U.S. Attorney
     General's rule interpreting the Controlled Substances Act to criminalize assisted suicide legal
26   under state law because the Controlled Substances Act only "gives the Attorney General limited
     powers, to be exercised in specific ways.")
27        [14] In *Defenders of Wildlife*, in the context of considering whether a court injunction
     ordering the FWS to issue a regulation under section 7 would redress the plaintiffs' injuries, as
28   relevant to standing, the plurality wrote that such a regulation "would not remedy respondents'

33

1  agency to promulgate regulations under section 7, but rather, only authorized the "*Secretary* . . . to

2  promulgate such regulations as may be appropriate to enforce" the ESA.  16 U.S.C. § 1540(f)

3  (emphasis added).

4          Indeed, when promulgating the regulations under section 7, the Service responded to

5  "[s]everal commenters" who argued that "Congress did not intend that the Service interpret or

6  implement section 7, and believed that the Service should recast the regulations as 'nonbinding

7  guidelines' that would govern only the Service's role in consultation."  51 Fed. Reg. at 19928.  In

8  response to these comments, the Service noted

9                  that Congress reviewed with approval the section 7 regulations
                   issued on January 4, 1978, when deliberating over the 1978
10                 Amendments to the Act . . . . Also, the Service was urged by the
                   House Committee, through its comments on the proposed rule, to
11                 press forward with the issuance of this final rule.

12  *Id.* (citing H.R. Conf. Rep. No. 1804, 95th Cong., 2d Sess. 18 (1978)).  The Service stated that it

13  was "satisfied that it has ample authority and legislative mandate to issue this rule, and believes

14  that uniform consultation standards and procedures are necessary to meet its obligations under

15  section 7."  51 Fed. Reg. at 19928.  In recognition of the possibility that "some Federal programs

16  may require a modified consultation process," the Service also "provided for the issuance of

17  counterpart regulations under § 402.04."  51 Fed. Reg. at 19928.

18          The Court finds that in promulgating 50 C.F.R. § 402.16, the Service did not exceed its

19  authority because § 402.16 simply defines a process by which federal agencies comply with their

20  obligations under section 7(a)(2) of the ESA.  When the Service promulgated the regulations

21  under section 7 of the ESA, the Service justified the mandatory nature of agencies' obligations to

22  initiate consultation under 50 C.F.R. § 402.14, and to reinitiate consultation under 50 C.F.R.

23  § 402.14, on the mandatory language of section 7(a)(2).  The Service expressly "declined" to

24  substitute the word "may" for "shall" when describing federal agencies' responsibilities under 50

25

26

27  alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very
    much an open question."  *Defenders of Wildlife*, 504 U.S. at 568.  Notably, five Supreme Court
    Justices declined to join the plurality's analysis on redressability, though none considered the issue
28  within the framework of *Chevron* deference.  *Id.* at 580, 584-85, 595-96.

United States District Court
Northern District of California

C.F.R. § 402.14(a) to determine whether formal consultation is required, noting, "Federal agencies have an obligation under section 7(a)(2) of the Act to determine whether their actions may affect listed species and whether formal consultation is required under these regulations." 51 Fed. Reg. at 19949. In other words, the Service never imposed a requirement that federal agencies consult with the Service; that requirement was imposed by Congress.

Indeed, the Service has distinguished between the "procedural" regulations that were promulgated under section 7 of the ESA, and the "substantive policy" adopted by Federal agencies after the section 7 consultation takes place. The Service noted that "[o]nce the mandatory consultation has taken place, . . . the ultimate responsibility for determining agency action in light of section 7 still rests with the particular Federal agency that was engaged in consultation." *Id.* (quoting 43 Fed. Reg. 870, 871 (Jan. 4, 1978)). In plain terms, the Service has promulgated "procedural regulations" under section 7 that "do not dictate results but prescribe a process by which the Service will consult in keeping with the Act." 51 Fed. Reg. at 19928. For this reason, the Service states that it "performs strictly an advisory function under section 7," and that each "Federal agency makes the ultimate decision as to whether its proposed action will satisfy" section 7 of the ESA. 51 Fed. Reg. 19926, 19928 (June 3, 1986); *see also* Intervenors Br. at 18.

In holding that the Service did not exceed its delegated authority in promulgating 50 C.F.R. § 402.16, the Court notes that § 402.16 does *not* authorize the Service to compel other federal agencies to initiate or reinitiate consultation. Indeed, the Service writes in the preamble to the 1986 Final Rules that "it lacks authority to require the initiation of consultation." 51 Fed. Reg. 19926, 19928 (June 3, 1986). The Service also recognizes "its lack of authority to require Federal agencies to *reinitiate* consultation if they choose not to." *Id.* at 19956 (emphasis added).

Intervenors quote several passages to support the argument that "[t]he ESA does not give the FWS the *power to order* other agencies to comply with its requests or to veto their decisions." Intervenors Reply Br. at 12 (quoting *Sierra Club*, 816 F.2d at 1386 (emphasis added)); *see also* Intervenor Br. at 18 ("the Secretary of the Interior *cannot require* another agency to consult with the Secretary about a project") (quoting Principal Brief of the Petitioners at 24, *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1991) (No. 90-1424), 1991 WL 577003, at *24 (July 12, 1991)

United States District Court
Northern District of California

1   (emphasis added)).  These quotes stand for the unremarkable proposition that the Service

2   disclaimed any authority under the ESA to compel other Federal agencies to initiate or reinitiate

3   consultation regarding an agency action.  This is a separate question from whether the Service had

4   authority to promulgate procedural regulations implementing section 7 of the ESA.

5          Having found that the Service did not exceed is delegated authority in promulgating 50

6   C.F.R. § 402.16, the Court considers whether the Service's interpretation of section 7(a)(2) is "a

7   reasonable policy choice for the agency to make."  *River Watch*, 633 F.3d at 772 (quotations

8   omitted).  To fill in the gap left open by Congress regarding the process of consultations that are

9   required by section 7(a)(2) of the ESA, the Service sought to interpret this ambiguity by

10  promulgating 50 C.F.R. § 402.16, which provides that "[r]einitiation of formal consultation is

11  required . . . where discretionary Federal involvement or control over the action has been retain or

12  is authorized by law," and one of four circumstances described in 50 C.F.R. § 402.16 are met.

13         The Court finds that § 402.16 is a reasonable interpretation of section 7.  There are textual

14  reasons that support this conclusion.  *See Sweet Home*, 515 U.S. at 697.  Section 7(a)(2) requires

15  federal agencies, "in consultation with and with the assistance of the Secretary," to "*insure* that

16  any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

17  *continued existence* of any endangered species" or critical habitat.  16 U.S.C. § 1536(a)(2)

18  (emphasis added).  As the Supreme Court has recognized, "[t]o 'insure' something … means to

19  make certain, to secure, to guarantee (some thing, event, etc.)."  *Home Builders*, 551 U.S. at 666-

20  67.  Moreover, to "insure" the "continued existence" certainly implies that cooperation between

21  the Service and federal agencies must be long-lasting.

22         The ESA's "broad purpose" also supports the promulgation of rules defining the

23  circumstances under which it is necessary to reinitiate consultation.  *Sweet Home*, 515 U.S. at 698

24  (finding that "the broad purpose of the ESA supports the Secretary's decision to extend protection

25  against activities that cause the precise harms Congress enacted to statute to avoid.").  The purpose

26  of section 7's consultation requirement is to avoid threats to endangered species.  When certain

27  circumstances change after an initial consultation has already taken place, common sense dictates

28  that the agencies must consult again, especially in light of the duty "to give endangered species

United States District Court
Northern District of California

United States District Court
Northern District of California

1  priority over the primary missions of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153,

2  185 (1978).

3       **2.     The "Agency Actions" for the Reinitiate Claims Have Been Superseded
4              for Reregistered Pesticides**

5       In 1989, the FWS issued a Biological Opinion entitled, "Effects of Pesticides on Aquatic

6  Endangered Species," which addressed several pesticide active ingredients included in Plaintiffs'

7  reinitiate claims. *See* SAC ¶¶ 845-46.  In 1993, the FWS issued another Biological Opinion,

8  entitled "Effects of 16 Vertebrate Control Agents On Threatened and Endangered Species," which

9  addressed a few additional active ingredients included in Plaintiffs' reinitiate claims. *See* SAC

10  ¶¶ 848-49.  Plaintiffs have identified each ingredient underlying their reinitiate claims as having

11  been the subject of consultations culminating in either the 1989 or 1993 Biological Opinion. *See,*

12  *e.g.*, SAC ¶¶ 1876, 1916.

13       As the EPA recognizes in its brief, the FWS issues a biological opinion after a formal

14  consultation with an agency regarding an agency action.  *See* EPA Br. at 6; 50 C.F.R. § 402.14(h)

15  (noting that the "biological opinion shall include . . . [a] detailed discussion of the effects of the

16  action on listed species or critical habitat").  As for the 1989 and 1993 Biological Opinions at

17  issue in this case, the relevant agency action was the EPA's registration of the pesticide chemicals

18  discussed in the Biological Opinions.  This is sufficiently alleged in the Second Amended

19  Complaint, *see* SAC ¶¶ 845-50.

20       Nonetheless, the EPA contends that if a RED is issued after the pesticide was discussed in

21  the FWS's 1989 and 1993 Biological Opinions, the issuance of that RED constitutes a "new"

22  agency action, which supersedes the prior agency action.  The EPA contends there can be no duty

23  to reinitiate consultation on an agency action which has been superseded.  Moreover, the EPA

24  contends that because there was no initial consultation on the new agency action (i.e., the issuance

25  of a RED), there can be no reinitiation of a consultation that never occurred.  *See* EPA Br. at 20-

26  23; EPA Reply Br. at 11-14; *see also* Intervenor Br. at 15 (agreeing with the EPA that "the SAC

27  fails to identify any EPA action subject to prior consultation for which consultation should have

28  been reinitiated").

1    For certain pesticides and their active ingredients, the Court agrees.  When an agency

2  consults with the Service, it does so about a particular agency action.  Here, the pesticide

3  registrations that gave rise to the two Biological Opinions are the agency actions in question.

4  However, pursuant to statute, all of those registrations were subject to the reregistration

5  requirements passed by Congress.  Indeed, Plaintiffs allege that for many of the pesticides at issue

6  in the reinitiation claims, the EPA has already completed reregistration.[15]  This reregistration has a

7  consequence:  as counsel for Plaintiffs conceded at oral argument, once the reregistration is

8  completed, it is the reregistration, not the original registration, that governs the pesticide in

9  question—i.e., the old registration is of no further force or effect.[16]  There can be no consultation

10  on registrations that are no longer in force.  It makes no sense to require a consultation by the EPA

11  with the Service on the question of whether the old registrations, which no longer govern

12  anything, have any effect on endangered species or their habitat.  If there is to be any consultation

13  it would only be on existing, not superseded, agency actions. Accordingly, the Court holds that

14  Plaintiffs cannot state a reinitiation claim based on the pesticide registration actions that gave rise

15  to the Biological Opinions at issue in this case, where reregistration is complete as to those active

16  ingredients that were the subject of the Biological Opinions.  Those claims are dismissed with

17  prejudice.

18    The Court disagrees, however, with the EPA's argument as to which subsequent actions

19  supersede the original registrations.  The actions that triggered the Biological Opinions were

20

21  [15] The SAC alleges that reregistration has been completed with respect to products containing the
following active ingredients: 2,4-D (¶ 864); acephate (¶ 881); aldicarb (¶ 897); atrazine (¶ 921);
22  bensulide (¶ 936); bromadiolone (¶ 968); captan (¶ 997); carbaryl (¶ 1023); chlorophacinone
(¶ 1038); chlorothalonil (¶ 1055); chlorpyrifos (¶ 1079); diazinon (¶ 1127); dicamba (¶ 1143);
23  dichlorprop (¶ 1157); diphacinone (¶ 1189); diuron (¶ 1206); ethoprop (¶ 1222); methomyl
(¶ 1274); naled (¶ 1289); oxydemeton-methyl (¶ 1304); oxyfluorfen (¶ 1320); paraquat dichloride
24  (¶ 1335); pendimethalin (¶ 1351); phorate (¶ 1382); phosmet (¶ 1397); profenofos (¶ 1412);
propargite (¶ 1429); S,S,S-tributyl phosphorotrithioate (¶ 1459); terbufos (¶ 1476); thiophanate-
25  methyl (¶ 1491); trichlorofon (¶ 1506); and trifluralin (¶ 1523) (all citations refer to SAC).
[16] "**THE COURT:** . . . Don't you agree that where there's been a reregistration of pesticide, you
26  reregister products or you reregistered an ingredient.  When you have reregistered these things, the
original registration . . . is no longer something that the users and manufacturers of those
27  pesticides have to follow.  Isn't that right?  They have to follow the new one instead.  Isn't that
correct?"
28  "**MR. AUGUSTINE:**  Yes, that's true."
Transcript of Oral Argument, *CBD v. EPA*, No. 11-0293 JCS (N.D. Cal. Aug. 8, 2014).

United States District Court
Northern District of California

product registrations, which are superseded by product reregistrations—not by REDs, which determine eligibility of active ingredients.  And while, as discussed above, the SAC alleges that reregistration is complete for products containing many active ingredients, it does not allege that reregistration is complete for certain other active ingredients.[17]  As to these ingredients, and the pesticides that include these ingredients, there is no allegation of a superseding reregistration.  As Plaintiffs have adequately pleaded triggering events, the motions to dismiss the reinitiation claims as to these substances are DENIED.

## V.      CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED in part and DENIED in part.  Claims 1 through 31 are dismissed with leave to amend as described above.  Claims 32 through 74 are dismissed in part without leave to amend.[18]  If Plaintiffs choose to file an amended complaint, they must do so within thirty (30) days of this order.

**IT IS SO ORDERED.**

Dated: August 13, 2014

_____
JOSEPH C. SPERO
United States Magistrate Judge

---

[17] These active ingredients are: brodifacoum (Claim 37); bromethalin (Claim 39); cypermethrin (Claim 45); dazomet (Claim 46); dimethoate (Claim 50); malathion (Claim 54); mancozeb (Claim 55); permethrin (Claim 62); simazine (Claim 67); warfarin (Claim 73); and zinc phosphide (Claim 74).

[18] As discussed above, the claims identified at footnote 17, *supra*, are not dismissed.