1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

Case No. 11-cv-00293-JCS

8

Plaintiffs,

9

v.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXTEND INSECTICIDE STRATEGY DEADLINE**

10

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

11

Defendants.

Re: Dkt. No. 447

12

13

## I.    INTRODUCTION

14

Pursuant to the parties' settlement agreement, Defendant Environmental Protection Agency

15

("EPA") agreed to "use its best efforts to issue a final Insecticide Strategy by January 17, 2025"

16

and further agreed that "in no event shall [EPA] issue [a final Insecticide Strategy] later than

17

March 31, 2025." Stipulated Settlement Agreement, docket no. 412, Paragraph II.C.1.a.

18

Presently before the Court is EPA's Motion to Modify the Stipulated Settlement Agreement to

19

Extend the Insecticide Strategy Deadlines ("Motion"). In the Motion, EPA requests a 90-day

20

extension of the March 31, 2025 deadline and a commensurate extension of the covenant not to

21

sue date in Paragraph IV.D.3. The Court finds that the Motion is suitable for determination

22

without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons stated below, the

23

Motion is GRANTED in part and DENIED in part.[1]

24

## II.    BACKGROUND

25

On September 12, 2023, this Court approved the parties' stipulated settlement agreement

26

that resolved all claims in the operative complaint and adopted its terms as an order of the Court.

27

---

28

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Dkt. no. 412 (Settlement Agreement) & 413 (Order Entering Stipulated Settlement Agreement).

2    The Settlement Agreement superseded an earlier partial settlement agreement that was approved

3    by the Court on October 22, 2019. Dkt. nos. 364, 366.  The Settlement Agreement set deadlines

4    for the completion of certain strategies related to the work plan that EPA issued on April 12, 2022,

5    entitled *Balancing Wildlife Protection and Responsible Pesticide Use: How EPA's Pesticide*

6    *Program Will Meet its Endangered Species Act Obligations*.  Settlement Agreement, Paragraph II,

7    preamble.  Among other things, the Settlement Agreement obligated EPA to complete a "strategy

8    to address vulnerable species that may be affected by insecticides ('Insecticides Strategy')." *Id.*

9    Paragraph II.C. EPA committed to "use its best efforts to issue a final Insecticide Strategy by

10   January 17, 2025, and in no event shall issue it later than March 31, 2025." *Id.*  Paragraph

11   II.C.1.a.

12         The parties also agreed to certain "milestones" in connection with the Insecticide Strategy,

13   including a July 30, 2024 deadline for EPA to provide the draft Insecticide Strategy for a 60-day

14   public comment period.  *Id.*  Paragraph II.C.2.b.  They further agreed that "[n]o later than 60 days

15   before January 17, 2025 (i.e. by November 18, 2024), [they would] meet and confer to discuss

16   whether EPA expect[ed] to issue a final Insecticide Strategy by January 17, 2025" and that

17   "[w]ithin 10 days after the Parties' [met] and confer[red] (i.e. by November 29, 2024), EPA

18   [would] provide a status report to the Court on its progress toward completing the final Insecticide

19   Strategy and the outcome of the Parties' meet and confer." *Id.*  Paragraph II.C.2.a.   EPA agreed

20   that when it issued the final Insecticide Strategy, it would "include a Response to Comments

21   document for comments received during the public comment period on the draft Insecticide

22   Strategy." *Id.*  Paragraph II.C.2.c.

23         The Settlement Agreement contains a provision entitled "Modification of Terms" that

24   provides as follows:

25         1. The Order entering this Stipulated Settlement Agreement
              ("Order") may only be modified by the Court. The Order may be
26            modified upon good cause shown by stipulated motion of all
              Parties filed with and approved by the Court, or upon written
27            motion filed by one of the Parties and granted by the Court after
              appropriate briefing.
28

2. Except as provided in Paragraph IV.B.3. below, any Party interested in modifying any term of the Agreement shall provide all Parties written notice of the proposed modification and the reasons for such modification. The Parties shall meet and confer (telephonically or in person) no later than ten business days after written notice in a good faith effort to resolve any modification dispute and agree upon a stipulated motion to modify the Order.

3. If EPA seeks to modify a deadline for a final Biological Evaluation required by this Agreement, it shall provide written notice of the proposed modified deadline and the reasons for it at least 60 days prior to the deadline in the Order. The Parties shall meet and confer (telephonically or in person) no later than ten business days after written notice in a good faith effort to agree upon a stipulated motion to do so. If the Parties are unable to agree, and EPA still seeks to modify a Biological Evaluation deadline, EPA shall move to modify the deadline at least 45 days prior to the deadline in the Order.

*Id.* Paragraph IV.B.

In addition, the Settlement Agreement includes a section entitled, "Covenant Not to Sue." *Id.* Paragraph IV.D.  In that section, Plaintiff agrees, *inter alia*, "not to bring, assist any other person or entity in bringing, or join any other person or entity in a new court proceeding alleging that EPA has violated ESA Section 7 pertaining to the effects of products containing the insecticide active ingredient propargite identified in Claim Twenty-Nine of the Fourth Amended Complaint until six months after the earlier of: (1) issuance of the final Insecticide Strategy as specified above in Paragraph II.C. of this Agreement; or (2) March 31, 2025." *Id.* Paragraph IV.D.3.

Finally, the Settlement Agreement includes a term entitled "Discretionary Rights." Settlement Agreement Paragraph IV.H.  That section makes clear that "[e]xcept as expressly provided in [the Settlement] Agreement, nothing [in it] shall be construed to limit or modify any discretion accorded EPA by statute, regulation or by general principles of administrative law." Settlement Agreement Paragraph IV.H.  That section further provides that "[n]o provision in [the Settlement] Agreement requires EPA to take any action under FIFRA." *Id.*

On July 25, 2024, five days before the deadline set in the Settlement Agreement, EPA issued its draft final Insecticide Strategy for public comment.  Messina Decl. ¶ 26.  The public comment period ended on September 23, 2024.  *Id.*  The Parties met and conferred on November 6, 2024 regarding EPA's progress toward completing the final Insecticide Strategy and on

1   November 15, 2024, EPA filed a status report "advising the Court that due to the volume of public

2   comments received on the draft Insecticide Strategy and EPA's ongoing work on other pesticide

3   program obligations, including those under the Stipulated Settlement Agreement, EPA could not

4   issue the Insecticide Strategy by January 17, 2025, but anticipated issuing the Insecticide Strategy

5   by the March 31, 2025 deadline in the Agreement." Messina Decl. ¶ 29; *see also* dkt. no. 446 at

6   p. 2.

7           Since the Settlement Agreement was adopted, the Court has approved three extensions of

8   deadlines in the Settlement Agreement, all of which were pursuant to stipulations by the parties.

9   *See* dkt. nos. 419 (extending the deadline in Paragraph I.B.2.a. of the Stipulated Settlement

10  Agreement, setting the deadline for EPA to issue a draft Biological Evaluations for Brodifacoum,

11  Bromadiolone, Warfarin, and Zinc Phosphide, from November 12, 2023 to December 15, 2023

12  but specifying that all other deadlines in the Settlement Agreement remained unchanged); 423

13  (extending the deadline in Paragraph I.B.1. of the Stipulated Settlement Agreement, setting the

14  deadline for EPA to issue the final Biological Evaluations on the effects of certain active

15  ingredients on ESA-listed endangered and threatened species and designated critical habitat, from

16  November 12, 2024 to November 27, 2024 based on extension of public comment period by the

17  same amount of time and modifying Associated Milestone in Paragraph I.B.2.c accordingly but

18  specifying that all other deadlines in the Settlement Agreement remained unchanged);  427

19  (extending the deadline in Paragraph II.A.1. of Stipulated Settlement Agreement, setting the

20  deadline for EPA to issue a final Herbicide Strategy, from May 30, 2024 to August 30, 2024 and

21  modifying Associated Milestone in Paragraph II.A.2.a accordingly but specifying that all other

22  deadlines in the Settlement Agreement remained unchanged).  The parties have never stipulated to

23  modify the deadlines set forth in Paragraph IV.D, establishing deadlines related to Plaintiff's

24  covenant not to sue.

25          EPA filed the instant motion on February 28, 2025.  Apparently, counsel selected the

26  motion to amend docketing event in the Court's electronic filing system, which does not permit

27  the filer to notice the motion for hearing.  Otherwise, a hearing would have been noticed, as a

28  matter of course, on the 35-day track set forth in Civil Local Rule 7-2(a), resulting in a motion

United States District Court
Northern District of California

1    hearing date of April 9, 2025 -- after the expiration of the deadline EPA seeks to extend.

2          In the Motion, EPA contends it needs a 90-day extension of the deadline to issue its final

3    Insecticide Strategy under Paragraph II.C.1.a. for two reasons.  Motion at 1.  First, it points to the

4    large number of public comments it needs to respond to related to the final Insecticide Strategy.

5    *Id.*  Second, it points to the change of administration on January 20, 2025, resulting in "new EPA

6    leadership who are still in the process of familiarizing themselves with the issues presented in the

7    Insecticide Strategy."  *Id.*

8          As to the need for an extension of deadlines in order to respond to public comments, the

9    EPA states that it received approximately 26,000 comments, including about 230 unique

10    comments in response to the draft final Insecticide Strategy. *Id.*  at 4 (citing Messina Decl.  ¶¶ 26,

11    39-40).  EPA represents that it "has a team of staffers who are tasked with reviewing comments,

12    analyzing the new information, and briefing management" and that "[t]his team has been meeting

13    multiple times a week since the close of the comment period."  Messina Decl. ¶ 44.  Nonetheless,

14    it states that at the time it met and conferred with Plaintiffs, in November 2024, it had only begun

15    to categorize and identify the comments. *Id*. (citing Messina ¶ 47).  According to EPA, once it

16    began to review the comments in detail, it discovered that it would need "additional time to

17    finalize the strategy . . . to evaluate the comments and data, and consider whether changes are

18    needed."  *Id.*  (citing Messina Decl. ¶ 48).

19          EPA points out that "it took . . . approximately thirteen months to finalize the Herbicide

20    Strategy after issuing the draft Herbicide Strategy" whereas the March 31, 2025 deadline for the

21    final Insecticide Strategy allows only nine months for the finalization of the draft Insecticide

22    Strategy. *Id.* (citing Messina Decl. ¶ 49). EPA represents that it believed when it filed its

23    November 2024 status report that the shorter time period would be sufficient because "its previous

24    experience finalizing the Herbicide Strategy would result in a faster process for finalizing the

25    Insecticide Strategy."  *Id.*  (citing Messina Decl. ¶ 46). This did not turn out to be the case,

26    according to EPA, because "the public comments on the draft Insecticide Strategy contain more

27    information and analysis than those on the draft Herbicide Strategy."  *Id.*  at 5 (citing Messina

28    Decl. ¶ 45). EPA further represents that it "requires additional time to complete its ongoing

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    discussions with its federal partner agencies and stakeholders regarding important issues

2    implicated by the Insecticide Strategy." *Id.* (citing Messina Decl.  ¶¶ 59-60).

3            EPA points to a further reason for requesting additional time to issue the final Insecticide

4    Strategy:  On February 24, 2025, it "received a joint letter from the Chairmen of the House

5    Committee on Agriculture and Senate Committee on Agriculture, Nutrition, and Forestry, in

6    which Congressional members urged EPA to "renegotiate its March 31, 2025 deadline to finalize

7    the Insecticide Strategy to allow additional time to review and improve the strategy and its

8    supporting risk assessment process." *Id.*  at 6 (citing Messina Decl. ¶ 38); *see also* Parent Decl.,

9    Ec. D (February 24, 2025 Letter).  The February 24, 2025 Letter states, in part, as follows:

> American farmers rely on EPA's implementation of the science-driven, risk-based, congressionally mandated registration and registration review process under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) to ensure continued access to critical crop protection tools to help increase yields, use fewer inputs, and implement conservation practices, which improve soil health.
>
> As such, we write today to bring your attention to various strategies written by the previous Administration, including the final Herbicide Strategy, the Vulernable (sic) Species Action Plan, and the draft Insecticide Strategy.  While these strategies were drafted to comply with section 7 of the Endangered Species Act (ESA), they fundamentally change the implementation of FIFRA and would have a significant impact on farm country. We request that EPA renegotiate the court ordered deadline for the Insecticide Strategy to allow time for a thorough review. Importantly, it is essential that products not be vacated and all necessary steps to avoid that outcome are pursued.

19   Parent Decl., Ex. D.

20          EPA also represents that it cannot meet the March 31, 2025 deadline "because certain

21   agency resources, which EPA anticipated being available to assist with the strategy, needed to be

22   diverted to accomplishing other important and related efforts."  Motion at 6 (citing Messina Decl.

23   ¶ 50).  These include "developing assessments using the Herbicide Strategy framework for

24   registration review cases, new active ingredient registration actions, and herbicides in consultation

25   with FWS and the National Marine Fisheries Service, and build[ing] staff-level capacity to

26   develop those assessments[;]"  "mapping refinements for where mitigation measures would apply;

27   updating EPA's 'mitigation menu' website used to assist pesticide users and growers in

28   determining whether their particular situation would require additional measures prior to applying

United States District Court
Northern District of California

1   a pesticide; developing a new Pesticides and Endangered Species Educational Resources Toolbox

2   website to house educational materials pertaining to the strategies and ESA-listed species

3   mitigation; and develop[ing] educational materials and tools to assist in the implementation of the

4   Herbicide and Insecticide strategies and Vulnerable Species Action Plan, including EPA's

5   'calculator,' which allows applicators and growers to input their specific location and field

6   parameters to determine whether they may need to employ additional runoff/erosion mitigation

7   measures." *Id.* (citing Messina Decl. ¶¶ 51-52).

8          The second reason for EPA's request is in order to allow time for "the new political

9   appointees in the Assistant Administrator's Office of Chemical Safety and Pollution Prevention

10  ("OCSPP"), which oversees EPA's Office of Pesticide Programs ('OPP')—the office responsible

11  for issuing the Insecticide Strategy" to receive briefing related to "the background and issues

12  related to the Insecticide Strategy and to ensure that their policy objectives are considered when

13  finalizing the strategy." *Id.* at 8 (citing Messina Decl. ¶¶ 63, 66). At the time the Motion was

14  filed, EPA anticipated that the briefing process would involve weekly briefings through March

15  and represented that this will further delay issuance of the final Insecticide Strategy due to "EPA's

16  historical limited resources," which require that "the staff assigned to work on the final Insecticide

17  Strategy and responses to comments on the draft strategy are the same staff tasked with

18  developing briefing materials." *Id.* at 8 (citing Messina Decl. ¶¶ 67, 68). EPA represents that

19  "staff have sent the draft final Insecticide Strategy for review through the various levels

20  of middle management in OPP, but not yet to [the Director of OPP (Messina)] nor to the new

21  political leadership." Messina Decl. ¶ 67. According to Messina, "[t]he strategy and

22  supporting documents are over 350 pages." *Id.*

23         EPA states that "[i]f the Court grants the requested extension and EPA is allowed

24  sufficient time to complete this process, the agency expects that it would complete OPP

25  management and [Office of Chemical Safety and Pollution Prevention] new leadership briefings

26  by early April." Motion at 9 (citing Messina Decl. ¶ 69). According to EPA, "[t]hroughout April

27  and May, [it] expects to make any necessary revisions to the Strategy, supporting documentation,

28  and responses to comments." *Id.* (citing Messina Decl. ¶ 70). "By early June, EPA expects to

1    request review by OPP management and new leadership of any changes made to the Strategy and

2    supporting documents, [Messina Decl. ¶ 71], and by mid-June, EPA expects to complete any

3    revisions based on management and new leadership review, [Messina Decl. ¶ 72]. If granted this

4    time to adequately complete the outlined process, EPA expects that it would issue the final

5    Insecticide Strategy by June 30, 2025. [Messina Decl. ¶ 73]." *Id.*

6          Plaintiffs, having stipulated to all past EPA requests for extensions, Messina Decl. ¶ 32,

7    oppose EPA's request for an extension, arguing that modification of the Settlement Agreement is

8    governed by Rule 60(b) of the Federal Rules of Civil Procedure and that under the legal standards

9    that govern Rule 60(b) motions, EPA has not met its burden.  Opposition at 1-2. They further

10   assert that the Motion should be denied because EPA did not file the Motion within a "reasonable

11   time[,]" as required under Rule 60(c)(1). *Id.* at 2.  In particular, they argue that the Motion was

12   untimely because EPA did not file it in time for the Court to hear the Motion (much less, decide

13   the Motion) on the normal schedule under Local Rule 7-2 before the expiration of the deadline in

14   the Settlement Agreement. *Id.* at 2.

15         According to Plaintiffs, Rule 60(b)(5), which permits the Court to modify a court order

16   where "applying it prospectively is no longer equitable[,]" " 'provides a means by which a party

17   can ask a court to modify or vacate a judgment or order if a significant change either in factual

18   conditions or in law renders continued enforcement detrimental to the public interest.'" *Id.* at 5

19   (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quotations omitted)). "Ordinarily[,]"

20   Plaintiffs contend, " 'modification should not be granted where a party relies upon events that

21   actually were anticipated at the time it entered into a decree.' " *Id.* (quoting *Rufo v. Inmates of*

22   *Suffolk Cty. Jail*, 502 U.S. 367, 385 (1992)).    Where subsequent events should have been

23   foreseen, Plaintiffs argue, "the party seeking modification must 'satisfy a heavy burden to

24   convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with

25   the decree, and should be relieved of the undertaking under Rule 60(b)'." *Id.* (quoting *Rufo*, 502

26   U.S. at 385).

27         Plaintiffs argue that EPA has not demonstrated that there is any significant change in fact

28   that was not anticipated. *Id.* at 5. With respect to the number of comments received and the

United States District Court
Northern District of California

8

1     amount of information contained in them as compared to the draft Herbicide Strategy, Plaintiffs

2     note that EPA does not provide any information about how many comments were received on the

3     draft Herbicide Policy.  *Id.* at 5 (citing Messina Decl. ¶¶ 39-48). Furthermore, Plaintiffs point out

4     that USDA's "comments on the draft Insecticide Strategy were 18 pages compared to the 36 pages

5     of comments the agency submitted on the draft Herbicide Strategy." *Id.* at 6 (citing Parent Decl.

6     Ex. B (USDA Herbicide Strategy comments), Ex. C (USDA Insecticide Strategy comments)).

7     According to Plaintiffs, "USDA's draft Insecticide Strategy comments are not only shorter, but

8     they also raise many similar issues, thus, hardly unanticipated." *Id.*  Moreover, Plaintiffs assert,

9     when EPA informed Plaintiffs and the Court in November 2024 that it could meet the March 31,

10    2025 deadline, it had been reviewing the public comments on the draft final Insecticide Strategy

11    for seven weeks and thus, it cannot argue that the quantity or content of the comments were not

12    anticipated.  *Id.* at 6.

13         Likewise, the other tasks EPA staff are engaged in that EPA says prevent it from meeting

14    the March 31, 2025 deadline were also anticipated at the time of the meet-and-confer in November

15    2024, Plaintiffs contend. *Id.*  at 6-7. First, some of the tasks listed by the EPA, including a webinar

16    conducted in September 2024 and release of a "mitigation calculator" and "toolbox" webpage in

17    October 2024, had already been completed at the time of the November meet-and-confer and

18    therefore were not unanticipated changes in circumstances that would justify modification of the

19    Settlement Agreement.  *Id.*  at 7 (citing Messina Decl. ¶ ¶ 54-57).   Furthermore, Plaintiffs assert,

20    "[o]ther work that EPA cites is the same workload that EPA must routinely undertake or was

21    anticipated in the Settlement Agreement, including work on registration review cases,

22    implementation of the Herbicide Strategy, new active ingredient registrations, and ongoing ESA

23    consultations on herbicides."  *Id.*  (citing Messina Decl. ¶¶ 50, 52).

24         According to Plaintiffs, "[t]he only 'change' that has occurred is there is a new presidential

25    administration, yet this can hardly be characterized as unanticipated, including the typical briefing

26    of new leadership."  *Id.* at 7.  Plaintiffs point to the earlier deadline in the Settlement Agreement of

27    January 17, 2025 as evidence that the parties, in fact, took into account the change in

28    administration and sought to avoid the need for briefing of new appointees by setting a target

United States District Court
Northern District of California

1        deadline before the change in administration occurred.  *Id.*  Plaintiffs also highlight Messina's

2        statement that neither he nor the new political appointees at EPA have even seen the draft final

3        Insecticide Strategy, asking how Messina can attest to EPA's need for a 90-day extension of the

4        deadline without seeing the existing draft.  *Id.*at 8 ("For purposes of the present motion, at the very

5        least, it is puzzling how EPA can rely on a declarant to say the agency needs 90 more days to

6        finalize the strategy when he hasn't even seen the draft final that could easily be made available to

7        him.").

8                Plaintiffs also challenge EPA's request to the extent it is based on the February 24, 2025

9        Letter from two members of Congress asking the EPA to "renegotiate" the terms of the Settlement

10       Agreement.  *Id.*  (citing Parent Decl., Ex. D). According to Plaintiffs, the letter "list[s] tasks EPA

11       should undertake before finalizing the Insecticide Strategy, many of which are antithetical to years

12       of work already undertaken and some of which can be done after the Insecticide Strategy is

13       finalized, if necessary."  *Id.* (citing Parent Decl., Ex. D at 1-2 ("asking EPA to consider preventing

14       the use of "'voidance areas', otherwise known as Pesticide Use Limitation Areas, and to provide

15       educational materials to implement the strategies")).

16               Plaintiffs argue further that EPA has failed to establish that changed conditions "make

17       compliance more onerous, unworkable, or detrimental to the public interest."  *Id.*  (citing *United*

18       *States v. Asarco Inc*., 430 F.3d 972, 979 (9th Cir. 2005)).  According to Plaintiffs, "EPA's

19       completion of responses to comments received six months ago, continued briefings of the new

20       administration, and completion of the Insecticide Strategy that is already in draft final form are

21       workable in the timeframe ordered by the Court."  *Id.*  Furthermore, they assert, "[a]fter March 31,

22       EPA can further respond to commenters, continuing valuable outreach and education efforts on the

23       Insecticide Strategy, and further brief new leadership on the strategy and process."  *Id.*

24               Finally, Plaintiffs argue that the Motion should also be denied because EPA has not met its

25       "heavy burden" of demonstrating that it has made reasonable efforts to comply with the terms of

26       the Settlement Agreement.  *Id.*  at 9.

27               In its Reply, EPA argues that the Court should reject Plaintiffs' procedural arguments for

28       denying the Motion under Rule 60(c) and Civil Local Rule 7-2 because "the Stipulated Settlement

1    Agreement provides its own procedures for seeking modifications to the agreement, the

2    procedures identified by Plaintiffs are inapplicable, and the equities weigh in favor of considering

3    the motion on its merits." Reply at 1-8. EPA further asserts that it did not bring the Motion under

4    Rule 60(b), which does not apply. *Id.* at 9. Rather, it asserts, the "good cause" standard in

5    Section IV.B.1 of the Settlement Agreement applies to its request to extend the deadlines related

6    to the final Insecticide Strategy. *Id.* (citing *In re Diet Drugs  (Phentermine/ Fenfluramine/*

7    *Dexfenfluramine) Prods. Liab. Litig.*, 90 F. App'x 643 (3d Cir. 2004)). EPA argues that the

8    language of Section IV.B.1 supports that reading of the Settlement Agreement and suggests there

9    would be no reason to establish different standards for stipulated requests as opposed to disputed

10   requests. *Id.* ("Plaintiffs provide no explanation as to why the agreement's one standard would

11   not apply to both types of requests, especially when the two contemplated types of requests seek

12   the same relief (i.e., a modification of the settlement agreement).").

13   **III.    ANALYSIS**

14   **A.    Whether the Motion Should be Denied on Procedural Grounds**

15       The Court declines to rule on the Motion on procedural grounds. Assuming the

16   "reasonable time" requirement under Rule 60(c) applies, it is not clear what constitutes a

17   "reasonable time" under the terms of the Settlement Agreement and the circumstances of this case.

18   The Court also finds it significant that Paragraph IV.B.3 of the Settlement Agreement specifically

19   requires that any disputed request by EPA to modify a deadline for a final Biological Evaluation

20   covered by the Settlement Agreement must be filed "at least 45 days prior to the deadline in the

21   Order" whereas the Settlement Agreement does *not* impose such a requirement as to disputed

22   requests for modification of other deadlines.  In light of the parties' failure to expressly impose a

23   similar limitation as to requests to modify the deadline for issuing the final Insecticide Strategy,

24   the Court is hesitant to read into the Settlement Agreement a requirement that a motion must be

25   filed with sufficient time to hold a motion hearing under the schedule set forth in Local Rule 7-2,

26   as Plaintiffs request.

27       Furthermore, the Court has considered and decided EPA's Motion on an expedited basis,

28   which renders moot Plaintiffs' concern that the late filing of the Motion will permit "EPA to

1    effectively modify the Settlement Order unilaterally" during the time the Court is considering the

2    Motion to the extent the Motion is not decided before the March 31 deadline. *See* Opposition at 2.

3    Therefore, the Court exercises its discretion to consider the Motion on the merits.

### B.    Whether Motion is Governed by Rule 60(b)

5        Plaintiffs contend EPA's request is governed by Rule 60(b) of the Federal Rules of Civil

6    Procedure whereas EPA asserts that the modification provision in the Settlement Agreement

7    establishes a "good cause" standard for its request.  The Court concludes that Plaintiffs are correct.

8        The Settlement Agreement in this case is akin to a consent decree, which "is 'essentially a

9    settlement agreement subject to continued judicial policing.' "  *United States v. State of Or.*, 913

10   F.2d 576, 580 (9th Cir. 1990) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983)).

11   Therefore, the Court looks to the case authority governing modification of consent decrees to

12   determine the appropriate legal standards to apply to EPA's request for a modification of the

13   deadlines in the Settlement Agreement.

14       A consent decree "has attributes of a contract and a judicial act, [and] is construed with

15   reference to ordinary contract principles." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846,

16   861 (9th Cir. 2007) (quoting *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir.

17   1985)). At the same time, the Supreme Court has recognized that a consent decree, while "in some

18   respects . . . contractual in nature", is "enforceable as [ ] a judicial decree that is subject to the

19   rules generally applicable to other judgments and decrees[,]" including Rule 60(b).  *Rufo v.*

20   *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992).

21       Here, the Court starts by looking to the plain terms of the modification provision in

22   Paragraph IV.B.1, which provides that the Settlement Agreement "may be modified upon good

23   cause shown by stipulated motion of all Parties filed with and approved by the Court, or upon

24   written motion filed by one of the Parties and granted by the Court after appropriate briefing."

25   Settlement Agreement, Paragraph IV.B.1.  EPA contends "[t]he clear intent behind these terms is

26   to allow a party to (jointly or individually) seek a modification to the agreement when there is

27   good cause for doing so."  Reply at 9.  Yet the punctuation of the provision points to the opposite

28   conclusion.  In particular, the "good cause" standard is contained in a separate clause specifying

United States District Court
Northern District of California

12

1   that "good cause" is "*shown* by stipulated motion of all parties."  The second possibility is set

2   forth after the comma and does not contain a good cause standard.  Indeed, the first way to modify

3   the consent decree, by stipulation and order, states that the agreement may be modified "upon

4   good cause shown by [the stipulation]", whereas the second method states that the agreement may

5   be modified "upon written motion . . . "  Clearly, the "good cause" standard, and the "written

6   motion" standard, are alternatives, not the same standard for modifying the agreement.  Of course,

7   it would have been a simple matter to phrase this paragraph so as to make clear that the good

8   cause standard applied to *all* requests for modification, whether stipulated or disputed.   Indeed, in

9   the single case cited by EPA to support its reading of the modification provision, the parties had

10  done just that, stating in the settlement agreement in that case that "[a]t any time, the Court may

11  extend any [relevant] time period for good cause shown upon application by the Parties . . . ." *In*

12  *re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig*., 90 F. App'x 643,

13  645 (3d Cir. 2004).  Yet they did not do so. Nor did the parties include a provision making clear

14  that the usual rules that govern modification of a court order, including Rule 60(b), do *not* apply to

15  disputed requests for modification of the Settlement Agreement. Therefore, the Court concludes

16  that Rule 60(b) governs EPA's request to extend the deadlines associated with issuance of the final

17  Insecticide Strategy.[2]

18          **C.    Whether Relief is Warranted Under Rule 60(b)**

19          A court may modify a consent decree under Rule 60(b)(5) of the Federal Rules of Civil

20  Procedure, which allows the court to relieve a party from a final judgment where "it is no longer

21  equitable that the judgment should have prospective application." *United States v. ASARCO Inc.*,

22  430 F.3d 972, 979 (9th Cir.2005) (quoting Fed.R.Civ.P. 60(b)(5)). To establish that modification

23  is appropriate, the moving party must meet the initial burden of showing "a significant change

24  either in factual conditions or in the law" that make compliance "more onerous, unworkable, or

25  detrimental to the public interest" than anticipated at the time the consent decree was entered. *Id*.

26  (citations omitted). Once that burden is met, the district court must determine whether the

27  

28  [2] The Court notes, however, that it would reach the same result if it applied a good cause standard
    to EPA's request.

United States District Court
Northern District of California

1   modifications sought are "suitably tailored to resolve the problems created by the changed factual

2   or legal conditions." *Id*. Generally, a consent decree should not be modified where the party

3   seeking modification relies on events that were anticipated at the time it entered into the

4   agreement. *Id*.

5         Here, EPA's request presents a close call as many of the justifications EPA offers for

6   extending the deadline to issue the final Insecticide Strategy fall far short of the standards set forth

7   above.  First, the assertion that EPA had not, at the time of the November 2024 meet-and-confer,

8   reviewed the public comments in sufficient detail to accurately evaluate the time that would be

9   required to respond to them, *see* Messina Decl. ¶¶ 47-48, is not credible.  Were the Court to accept

10   this representation on its face, it  would have to conclude that despite a seven-week interval after

11   the close of public comments and a team of EPA staffers "tasked with reviewing comments,

12   analyzing the new information, and briefing management[,]" who were "meeting multiple times a

13   week since the close of the comment period[,]" Messina Decl. ¶¶ 43-44, EPA came to the meet-

14   and-confer unprepared and without a clear understanding of the scope of the task before it.   The

15   Court is confident that that is not what occurred.

16         Moreover, even assuming that the public comments on the draft final Insecticide Strategy

17   were lengthier and/or contained more information than the comments received on the draft final

18   Herbicide Strategy (a question the Court need not decide), EPA had ample time to discern that fact

19   before it met and conferred with Plaintiffs and then represented to the Court that it expected to be

20   able to meet the March 31, 2025 deadline.  Nor does EPA explain why any of the other activities it

21   describes in the Motion and accompanying declaration were reflective of an unanticipated change

22   in circumstances that would justify modifying the terms of the Settlement Agreement.

23         It also should go without saying that EPA is bound by the Settlement Agreement and may

24   not seek to "renegotiate" the terms of the agreement, as certain members of Congress have

25   requested.  Rather, modifications to the terms of the Settlement Agreement are permissible *only* to

26   the extent they are permitted under the terms of the Settlement Agreement and applicable law.

27   Nor has EPA cited any authority that suggests that a change in administration, by itself, constitutes

28   good cause or offers an equitable reason sufficient to justify modifying the terms of a settlement

United States District Court
Northern District of California

14

1    agreement under Rule 60(b)(5).  Were courts to adopt such an approach, it would mean,

2    essentially, that parties could not enter into settlement agreements or consent decrees with an

3    agency of the United States that spanned more than one administration as they could not count on

4    adherence to the terms of the settlement agreement by subsequent administrations. Yet the

5    agencies of the United States have a long history of entering into consent decrees that bind future

6    administrations, and of abiding by those agreements.

7         The Court also finds unpersuasive EPA's assertion that the current deadline did not allow

8    sufficient time for briefing of new political leadership given that EPA had over two months to

9    complete that task after the change of administration and the change of administration was

10   anticipated at the time EPA filed its November 15, 2024 status report stating that it could meet the

11   March 31, 2025 deadline.  The Court finds particularly troubling the fact that EPA is seeking a

12   three-month extension when its political leadership – and even its declarant, who is head of OPP --

13   has not yet read the current version of the final Insecticide Strategy that is being circulated at the

14   mid-level of EPA management.  In addition to reflecting a lack of diligence on the part of EPA in

15   meeting its obligations related to issuance of the final Insecticide Strategy, Messina's failure to

16   review that document makes it impossible for him to speak knowledgeably to the question of

17   whether the duration of the requested extension is reasonable or if an extension is even necessary.

18   Why, for example, do EPA staffers require two more months to finalize the Insecticide Strategy?

19   Messina states that EPA staffers need the months of April and May to "make any revisions to the

20   strategy, supporting documentation, and responses to comments[,]" Messina Decl. ¶ 70, but does

21   not explain how that determination was made; apparently, it was not  based on his own evaluation

22   of the current drafts of the Insecticide Strategy or responses to public comments, which he has not

23   reviewed.

24        The only equitable reason the Court can discern for allowing *any* extension of the deadline

25   to issue the final Insecticide Strategy is simply that because there are only a few days between this

26   decision and the March 31 deadline, enforcing that deadline would effectively punish the EPA for

27   not filing this Motion earlier (which would have allowed a longer time period between the Court's

28   decision and the March 31 deadline).    While that is certainly within the Court's power, the Court

United States District Court
Northern District of California

15

1    finds that equity supports an extension of the March 31, 2025 deadline under Paragraph II.C.1.a to

2    April 30, 2025. The Court does not, however, extend the deadline on the covenant not to sue under

3    Paragraph IV.D. 3 of the Settlement Agreement.  EPA offered no justification for extending that

4    deadline and none of the previous stipulated extensions of deadlines extended the associated

5    deadlines on the covenants not to sue.

6    **IV.    CONCLUSION**

7        For the reasons stated above, the Motion is GRANTED in part and DENIED in part.  The

8    deadline for issuing the final Insecticide Strategy and responses to public comments is extended to

9    April 30, 2025.  No other deadline shall be modified.

10        **IT IS SO ORDERED.**

11

12   Dated: March 25, 2025

13   _____

14   JOSEPH C. SPERO
     United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California